PARSONS ET AL. *v.* SMITH, FORMER COLLECTOR
OF INTERNAL REVENUE.

No. 218. Argued March 4, 1959.—Decided April 6, 1959.*

*Sherwin T. McDowell* argued the cause for petitioners
in No. 218. With him on the brief were *William R.
Spofford* and *Charles I. Thompson, Jr.*

*David Berger* argued the cause for petitioners in No.
305. With him on the brief was *Leon H. Kline.*

*Howard A. Heffron* argued the causes for respondent.
On the brief were *Solicitor General Rankin, Assistant
Attorney General Rice, Daniel M. Friedman* and *Marvin
W. Weinstein.*

*Edgar J. Goodrich* and *Lipman Redman* filed a brief for
the Estate of John Schumacher, as *amicus curiae,* urging
reversal.

*Frederick Bernays Wiener* and *Le Roy Katz* filed a
brief in No. 218 for Paragon Jewel Coal Co., Inc., as
*amicus curiae,* urging affirmance.

---

*Together with No. 305, *Huss et al.* v. *Smith, Former Collector of
Internal Revenue,* also on certiorari to the same Court.

Mr. Justice Whittaker delivered the opinion of the Court.

These tax refund cases present the question whether petitioners, Parsons in No. 218 and Huss in No. 305, are entitled to an allowance for depletion on amounts received by them under contracts with the owners of coal-bearing lands for the strip mining of coal from those lands and the delivery of it to the landowners. The cases were heard by the same courts below. The District Court ruled that petitioners had no depletable interest in the coal in place and rendered judgment for the respondent—collector in each case. The Court of Appeals affirmed both judgments. 255 F. 2d 595, 599. Because of an asserted conflict with the principles applicable under the decisions of this Court, we granted certiorari in both cases. 358 U. S. 814.

The pertinent facts in each case were found by the District Court and are not challenged here. In substance, they are as follows:

PARSONS, No. 218. Petitioners were members of a partnership ("Parsons") which, until the transactions involved here, was primarily engaged in road building. Rockhill Coal Co. ("Rockhill") owned bituminous coal-bearing lands in Pennsylvania. Much of the coal was located relatively near the surface and was therefore removable by the strip mining process.[1] In 1942 Parsons expressed a desire to strip mine coal from Rockhill's lands, but it refused to sign the written contract offered because the firm did not wish to be bound by a contract "which would take a long time, since, if an opportunity opened up, [it] wanted to go back to road building." It was then agreed that Parsons would, and it did, proceed under

---

[1] Strip mining is done from the surface of the earth. In general, it is performed by stripping off the earth, known as overburden, which lies over the coal and then removing the coal so uncovered.

an oral agreement. Under that agreement Parsons was to strip mine coal from such sites and seams, within a generally described area of Rockhill's lands, as were designated by Rockhill. Parsons was to furnish at its own expense all of the equipment, facilities and labor which it thought necessary to strip mine and deliver the coal to Rockhill's cars at a fixed point. For each ton of coal so mined and delivered Rockhill was to pay Parsons a stated amount of money.[2] Parsons was not authorized to keep or sell any of the coal but was required to deliver all that was mined to Rockhill. The agreement was not for a definite term, nor did it obligate Parsons to mine the tract to exhaustion, but, to the contrary, it was agreed that "if Parsons or Rockhill wanted to quit, all that was necessary to terminate the arrangement was the giving of a ten-day notice." However, if Rockhill thus canceled the agreement and if "Parsons had previously gone to the expense of removing the overburden (thereby performing the heavy part of the work, as well as meeting wages and expenses in so doing), then Parsons would have the privilege of taking out the coal [so uncovered] and of being paid for it [even though] this took more than ten days." Operations continued under the agreement without notice of termination until August 1, 1950, when Parsons gave Rockhill notice that it would "quit" the work on September 1, 1950, and it ceased these operations on or near that date. Large amounts of strippable coal still remained on the tract and strip mining thereon was continued by another contractor. Parsons' investment in equipment used in the work ran from a low in 1943 of $60,000 to a high in 1947 of $250,000. The equipment was movable

---

[2] It was contemplated by the parties that in the event of an increase in the union labor wage scale the amount per ton to be paid to Parsons would be increased and on several occasions it was increased to cover higher costs for both labor and material used in the work.

and there is no evidence that it was not usable elsewhere or for other purposes.

*HUSS*, No. 305. Petitioners were members of a partnership ("Huss") engaged in the business of strip mining coal. Philadelphia and Reading Coal & Iron Co. ("Reading") owned anthracite coal-bearing lands in Schuylkill County, Pennsylvania. Much of the coal was so located that it could be removed by strip mining. In 1944 Reading and Huss entered into a written contract [3] under which Huss undertook to strip mine the coal from such areas, within a generally described tract of Reading's land, as might be designated by Reading and that was not lying deeper than a prescribed distance from the surface. Huss was to furnish at its own expense all of the equipment, facilities and labor necessary to mine and deliver the coal to Reading's colliery. For each ton of coal so mined and delivered Reading was to pay Huss a stated sum.[4] That sum was agreed to be in "full compensation for the full performance of all work and for the furnishing of all material, labor, power, tools, machinery, implements and equipment required for the work." Huss was not authorized to keep or sell any of the coal. The contract was expressly terminable by Reading at any time upon 30 days' written notice "without specifying any reason therefor" and without liability for "any loss of anticipated profits or any other damages whatever." This right of termination was not exercised. Operations continued under the contract until July 1947, by which time

---

[3] During the tax years involved, which were 1944 to 1947, other like contracts were entered into by the parties, but they were all identical, except for areas covered and prices per ton to be paid to Huss, and it will therefore be unnecessary to treat with them individually.

[4] The contract provided, however, that in the event of an increase in the union labor wage scale the amount per ton to be paid to Huss would be, and on several occasions during the operation it was, increased sufficiently to cover increased labor costs.

Huss had mined most of the strippable coal on the lands covered by the contract that lay within the stipulated distance from the surface, and the contract was then canceled by mutual agreement. Huss' investment in equipment used in the work ran from a low in 1944 of $100,000 to a high in 1947 of $500,000. All of the equipment was movable and usable elsewhere in strip mining and some of it was usable for other purposes.

Whether a deduction from gross income shall be permitted for depletion of mineral deposits, or any interest therein, is entirely a matter of grace.[5] We therefore must look, first, to the provisions and purposes of the statutes and to the decisions construing them to see what interests are permitted a deduction for depletion, and, next, to the contracts involved to see whether they gave to petitioners such an interest.

The applicable statutes are §§ 23 (m) and 114 (b) (4) (A) of the Internal Revenue Code of 1939, 26 U. S. C. (1952 ed.) §.23 (m) and 26 U. S. C. (1946 ed.) § 114 (b) (4) (A). Section 23 (m) directs that a reasonable allowance for depletion shall be made "in the case of mines, . . . according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary," and that "[i]n the case of leases the deductions shall be equitably apportioned between the lessor and lessee." And § 114(b) (4) (A) provides that the allowance shall be, "in the case of coal mines, 5 percentum . . . of the gross income from [mining][6] the property during the taxable year, exclud-

---

[5] *Helvering* v. *Bankline Oil Co.,.* 303 U. S. 362, 366; *Anderson* v. *Helvering*, 310 U. S. 404, 408; *Commissioner* v. *Southwest Exploration Co.*, 350 U. S. 308, 312.

[6] Section 114 (b) (4) (B) provided that "the term 'gross income from the property' means the gross income from mining." 26 U. S. C. (1946 ed.) § 114 (b) (4) (B).

ing . . . any rents or royalties paid or incurred by the taxpayer in respect of the property."

The purpose of the deduction for depletion is plain and has been many times declared by this Court. "It is permitted in recognition of the fact that the mineral deposits are wasting assets and is intended as compensation to the owner for the part used up in production." *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362, 366. And see *United States* v. *Ludey*, 274 U. S. 295, 302; *Helvering* v. *Elbe Oil Land Development Co.*, 303 U. S. 372, 375; *Anderson* v. *Helvering*, 310 U. S. 404, 408; *Kirby Petroleum Co.* v. *Commissioner*, 326 U. S. 599, 603. "[The depletion] exclusion is designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is unimpaired." *Commissioner* v. *Southwest Exploration Co.*, 350 U. S. 308, 312. Save for its application only to gross income from mineral deposits and standing timber, the purpose of "the deduction for depletion does not differ from the deduction for depreciation." *United States* v. *Ludey*, 274 U. S., at 303. In short, the purpose of the depletion deduction is to permit the owner of a capital interest in mineral in place to make a tax-free recovery of that depleting capital asset.

Although the sentence in § 23 (m) that "In the case of leases the deductions shall be equitably apportioned between the lessor and lessee" presupposes "that the deductions may be allowed in other cases" (*Palmer* v. *Bender*, 287 U. S. 551, 557), the statute "must be read in the light of the requirement of apportionment of a single depletion allowance" (*Helvering* v. *Twin Bell Oil Syndicate*, 293 U. S. 312, 321), for two or more persons "cannot be entitled to depletion on the same income" (*Commissioner* v. *Southwest Exploration Co.*, 350 U. S. 308, 309). It follows that if petitioners are entitled to a depletion allowance on the amounts earned under their contracts,

the amounts allowable to the landowners for the depletion of their coal deposits would be correspondingly reduced.

Dealing specifically with the problem of what interests in mineral deposits were permitted a deduction for depletion under the practically identical predecessors of §§ 23 (m) and 114, this Court said in *Palmer* v. *Bender,* 287 U. S. 551, 557: "The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." The Court further said that the deduction is not "dependent upon the particular legal form of the taxpayer's interest in the property to be depleted, [and that] [i]t is enough if . . . he has retained a right to share in the oil produced. If so he has an *economic interest* in the oil, in place, which is depleted by production." [7] *Ibid.* (Emphasis added.) The Court went on to hold that lessees of oil producing properties, by reserving from an assignment a royalty of "one-eighth of all the oil produced and saved," retained

---

[7] The principles declared in the *Palmer* case have been recognized and applied by every subsequent decision of this Court that has treated with the subject.

*Helvering* v. *Bankline Oil Co.,* 303 U. S. 362, 367, literally adopted the language of the *Palmer* case upon the point.

In *Helvering* v. *O'Donnell,* 303 U. S. 370, 371, it was said: "The question is whether respondent had an interest, that is, a capital investment, in the oil and gas in place. . . . *Palmer* v. *Bender,* 287 U. S. 551, 557; *Helvering* v. *Twin Bell Oil Syndicate,* 293 U. S. 312, 321; *Thomas* v. *Perkins,* 301 U. S. 655, 661; *Helvering* v. *Bankline Oil Co., supra.*"

*Helvering* v. *Elbe Oil Land Development Co.,* 303 U. S. 372, 375–376, declared that "The words 'gross income from the property,' as used in the statute governing the allowance for depletion, mean gross income received from the operation of the oil and gas wells by one

an economic interest in the oil in place and were therefore entitled to an allowance for depletion against their gross income from that interest.

Five years later, in 1938, the Court in *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362, reaffirmed the test laid down in *Palmer* and added: "But the phrase 'economic interest' is not to be taken as embracing a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit." 303 U. S., at 367. Applying that principle, the Court held that a processor who, by contracts with the owners of gas and oil wells, had acquired the right to take wet gas from the wellheads and to extract and sell the gasoline therefrom, paying the well owners a percentage of the proceeds of such sales, had not acquired an economic interest in the depleting gas in place but only an economic advantage to be derived from the processing operations, and that therefore the

---

who has a capital investment therein,—not income from the sale of the oil and gas properties themselves."

*Anderson* v. *Helvering*, 310 U. S. 404, 408–409, repeated the statement last quoted.

In *Kirby Petroleum Co.* v. *Commissioner*, 326 U. S. 599, 603, the Court said: "The test of the right to depletion is whether the taxpayer has a capital investment in the oil in place which is necessarily reduced as the oil is extracted."

In *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U. S. 25, 32, the Court said: "It seems generally accepted that it is the owner of a capital investment or economic interest in the oil in place who is entitled to the depletion."

*Commissioner* v. *Southwest Exploration Co.*, 350 U. S. 308, 314, reannounced substantially the rule declared in the *Palmer* case. It said "that a taxpayer is entitled to depletion where he has: (1) 'acquired, by investment, any interest in the oil in place,' and (2) secured by legal relationship 'income derived from the extraction of the oil, to which he must look for a return of his capital.' . . . These two factors, usually considered together, constitute the requirement of 'an economic interest.' "

income from those operations was not subject to the depletion deduction.

In his first regulations prescribed under the Internal Revenue Act of 1939, the Commissioner adopted almost literally the language we have quoted from *Palmer* and *Bankline* as the tests to be administratively applied in determining what interests in mineral deposits are entitled to the depletion allowance. See Treas. Reg. 103, § 19.23 (m)–1, August 23, 1939. That language, with immaterial changes, has remained in the regulations ever since. During the years here involved, 1942 through 1950, the regulation in force was Treas. Reg. 111, § 29.23 (m)–1, which, in pertinent part, provides:

> "Under [the provisions of §§ 23 (m) and 114] the owner of an economic interest in mineral deposits or standing timber is allowed annual depletion deductions. An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the severance and sale of the mineral or timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because, through a contractual relation to the owner, he possesses a mere economic advantage derived from production . . . ."

Such are the interests that are permitted a deduction for depletion by the statutes as consistently interpreted by this Court and by the Commissioner.

Petitioners do not dispute that these are the controlling principles, but rather they contend that they come within those that allow the deduction. They argue that by their contracts to mine the coal, and particularly by contribut-

ing their equipment, organizations and skills to the mining project as required by those contracts, they, in legal effect, made a capital investment in, and thereby acquired an economic interest in, the coal in place, which was depletable by production, and that they are therefore entitled to take the deduction against their gross income derived from those mining operations.

We take a different view. It stands admitted that before and apart from their contracts, petitioners had no investment or interest in the coal in place. Their asserted right to the deduction rests entirely upon their contracts. Is there anything in those contracts to indicate that petitioners made a capital investment in, or acquired an economic interest in, the coal in place, as distinguished from the acquisition of a mere economic advantage to be derived from their mining operations? We think it is quite plain that there is not.

By their contracts, which were completely terminable without cause on short notice, petitioners simply agreed to provide the equipment and do the work required to strip mine coal from designated lands of the landowners and to deliver the coal to the latter at stated points, and in full consideration for performance of that undertaking the landowners were to pay to petitioners a fixed sum per ton. Surely those agreements do not show or suggest that petitioners actually made any capital investment in the coal in place, or that the landowners were to or actually did in any way surrender to petitioners any part of their capital interest in the coal in place. Petitioners do not factually assert otherwise. Their claim to the contrary is based wholly upon an asserted legal fiction. As stated, they claim that their contractual right to mine coal from the designated lands and the use of their equipment, organizations and skills in doing so, should be regarded as the making of a capital investment in, and the acquisition of an economic interest in, the coal in place.

But that fiction cannot be indulged here, for it is negated by the facts.

To recapitulate, the asserted fiction is opposed to the facts (1) that petitioners' investments were in their equipment, all of which was movable—not in the coal in place; (2) that their investments in equipment were recoverable through depreciation—not depletion; (3) that the contracts were completely terminable without cause on short notice; (4) that the landowners did not agree to surrender and did not actually surrender to petitioners any capital interest in the coal in place; (5) that the coal at all times, even after it was mined, belonged entirely to the landowners, and that petitioners could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that petitioners were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered, which was, as stated in *Huss*, agreed to be in "full compensation for the full performance of all work and for the furnishing of all [labor] and equipment required for the work"; and (7) that petitioners, thus, agreed to look only to the landowners for all sums to become due them under their contracts. The agreement of the landowners to pay a fixed sum per ton for mining and delivering the coal "was a personal covenant and did not purport to grant [petitioners] an interest in the [coal in place]." *Helvering* v. *O'Donnell,* 303 U. S. 370, 372. Surely these facts show that petitioners did not actually make any capital investment in, or acquire any economic interest in, the coal in place, and that they may not fictionally be regarded as having done so.

"Undoubtedly, [petitioners] through [their] contracts obtained an economic advantage from [their] production of the [coal], but that is not sufficient. The controlling fact is that [petitioners] had no interest in the [coal] in

place." *Helvering* v. *Bankline Oil Co.,* 303 U. S., at 368. Of course, the parties might have provided in their contracts that petitioners would have some capital interest in the coal in place, but they did not do so—apparently by design. Instead, petitioners simply entered into contracts, terminable without cause on short notice, with the owners of coal-bearing lands to provide the equipment and do the work required to strip mine and deliver coal from those lands, as independent contractors, for fixed unit prices. "[Petitioners thus] bargained for and obtained an economic advantage from the [mining] operations but that advantage or profit did not constitute a depletable interest in the [coal] in place" (*Helvering* v. *O'Donnell,* 303 U. S., at 372), and having "no capital investment in the mineral deposit which suffered depletion, [petitioners are] not entitled to the statutory allowance" (*Helvering* v. *Bankline Oil Co.,* 303 U. S., at 368). The judgments must therefore be

*Affirmed.*