**UNITED STATES of America,**
**Appellant,**

**v.**

**James C. and Helen M. STALLARD, and Dewey H. and Geneva Stallard,**
**Appellees.**

**No. 7904.**

United States Court of Appeals Fourth Circuit.

Argued Oct. 9, 1959.

Decided Dec. 29, 1959.

---

848

Marvin W. Weinstein, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Howard A. Heffron, Lee A. Jackson and Kenneth E. Levin, Attys., Dept. of Justice, Washington, D. C., John Strickler, U. S. Atty., and H. Clyde Pearson, Asst. U. S. Atty., Roanoke, Va., on the brief), for appellant.

John Y. Merrell, Washington, D. C. (Waldo G. Miles, Bristol, Va., on the brief), for appellees.

Frederick Bernays Wiener, Washington, D. C. (Wm. A. Stuart, Abingdon, Va., on the brief), for Clinchfield Coal Corp., amicus curiae.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

SOPER, Circuit Judge.

These consolidated cases raise the question whether the members of a partnership engaged in the strip mining of coal under a contract with the owners of the land are entitled to a deduction for depletion under § 23 and § 114(b) (4) of the Internal Revenue Code, 26 U.S. C.A. §§ 23, 114(b) (4) in computing their income tax for the year 1953. The District Court decided the point in the taxpayers' favor in the instant suit for refund and entered judgments against the United States for the sums of $15,-931.42, and $15,849.95, respectively, 170 F.Supp. 267, and the United States appealed.

Dewey H. Stallard and James C. Stallard, copartners trading under the name of Stallard Brothers, have been engaged in the strip mining of coal since 1947. On December 4, 1952, and on January 28, 1953, they entered into two contracts with Clinchfield Coal Corporation, the owner of the coal underlying two tracts of land near Dante, Virginia, known as Justice Fork and Lick Fork. The two contracts were set forth in letters from Clinchfield to the partners and contained substantially similar provisions which may be summarized as follows:

Stallard was to strip mine the tract as it had been or would be laid out from time to time by Clinchfield, and truck the coal to an agreed point and load it into mine cars provided by Clinchfield, subject to survey and examination of the mine workings by Clinchfield at all reasonable times. Stallard was to furnish the necessary explosives and equipment, employ and pay the miners, and provide competent supervision and control of the working forces. All of the coal mined was to be delivered to Clinchfield and none of it was to be otherwise delivered or sold. Mining operations were to proceed continuously so as to produce approximately 400 tons daily of the standard quality maintained by Clinchfield, except when prevented by market conditions or other circumstances beyond the control of the partners.

Clinchfield was to pay Stallard $3.22 per ton on a clean coal basis, which was arrived at by reducing the raw coal tonnage by 10 per cent to cover the estimated tipple rejects so that the price to be paid to Stallard amounted to $2.90 per net ton of raw coal loaded into the mine car.

The contract contained the following provision:

"This Mining Contract is subject to cancellation by either of the parties hereto upon the giving of thirty (30) days written notice, by the one to the other, of the party's intention so to do."

Stallard was to carry and pay for Workmen's Compensation and Employer's Liability Insurance covering their employees on the work, as well as Comprehensive Public Liability and Property Damage Insurance covering work performed under the contract.

Stallard was to be deemed an independent contractor solely liable for damages for injury to persons or property in the performance of the contract and was obligated to save Clinchfield harmless from liability for such damage. It also agreed to perform the contract in a workmanlike manner, in conformity with the relevant federal and state statutes, and to save Clinchfield harmless for all claims for labor or material used in the performance of the work.

In his opinion the District Judge found that the contractor, in order to do the work, was obliged to grade the area for laying the track for the coal cars, truck the coal from the mine and load it into the cars, and for this purpose was obliged to build access roads and ramps of relatively crude construction and to erect some buildings and a powderhouse at a cost of between $20,000 and $25,000; and that the partnership owned approximately $70,000 worth of equipment suitable for stripping operations and that, in order to perform the contract work, it was obliged to acquire additional heavy equipment at a cost of $300,000. Stallard's testimony showed that this equipment was suited for strip mining operations and that all that was usable was removed upon the completion of the operation and the taxpayers claimed depreciation upon it.

In 1955, the partnership, in order to continue operations, was obliged to acquire the right to use the surface land of other owners bordering on the job in order to haul coal to the agreed destination and for this privilege paid the owners 10-cents per ton for the right to haul the coal across their land, of which sum Clinchfield paid 5-cents per ton.

The District Judge made findings as to the meaning of the written contracts and the actions of the parties thereunder to the following effect:

The contracts did not contain a full embodiment of the agreements between the parties and the terms of the contract were not always followed during the progress of the work.

During the three years the contract was in effect the price paid by Clinchfield to the partnership varied from time to time, depending on supply and demand and the prices available to Clinchfield on the market. When market conditions were unfavorable Clinchfield notified the partnership of price reductions and the partnership complied. Thus, the price paid for the mining of the coal was geared to the general market price.

The cancellation clause was not discussed by the parties during the negotiations leading to the contract. Clinchfield understood that the clause would protect it if there was no market for the coal, while Stallard Brothers understood the clause was inserted to protect Clinchfield from a wasteful and unworkmanlike job. In fine, the contract was never intended to be terminable at the will of either party upon thirty days' notice but the parties contemplated that the partnership would exclusively mine the tracts to exhaustion, as was done.

The termination clause of the contract, as we shall see, has a most important bearing upon the central question in the case, and we pause in this statement of the essential facts to examine the ultimate finding of the court that the parties never intended that the contract might be terminated at the will of either party upon thirty days' notice, but only that the clause might be availed of if market conditions made the operation unprofitable or the partnership should fail to mine

the coal in a proper manner. Upon examination of the evidence, we do not find adequate support for the conclusion that the provision should not be given the meaning clearly and unambiguously set forth in the written document. It is true that the parties, for reasons known only to themselves, abandoned the parole evidence rule and testified without objection as to what the clause was intended to mean. John C. Stallard, the general manager of the firm, said that he supposed that Clinchfield could terminate the contract at any time on thirty days' notice but that the parties were thinking of an operation to last two or three years, with a daily output of 500 to 1,000 tons, and he understood that the firm had the right to exhaust the coal in the entire area. On the other hand, C. K. Tieche, the vice president of Clinchfield in charge of its interests under the contract, said that the termination clause was put into the writing so that Clinchfield would not be obliged to take any more coal than it needed and that there was no agreement that the taxpayers could mine all of the coal, although Clinchfield hoped that the operation would be mutually satisfactory and would be continued, as indeed it did continue, until all of the coal in both areas was extracted.

Obviously this testimony does not justify the finding that Stallard had been given the exclusive right by agreement of the parties to mine the tracts of land to exhaustion, whichever version of the understanding between them is accepted; and, accordingly, the termination clause must be construed in the light of its unambiguous terms to give either party the right to terminate the contract at will upon giving the specified notice. The possession of this power by Clinchfield doubtless explains the willingness of Stallard to accept reduction from time to time in the price paid per ton for the coal mined when Clinchfield found that marketing conditions were unfavorable. To this extent it was true that the price paid for mining the coal was geared to marketing conditions.

The statute upon which the taxpayers depend, § 114(b) (4) of the Internal Revenue Code, provides in effect that the allowance for depletion shall be 10 per cent of the gross income from the property during the tax year, excluding therefrom an amount equal to any rents or royalties paid in respect to the property for the taxpayer; and § 39.23 (m)–1 of Treasury Regulations 118 promulgated under the Internal Revenue Code of 1939 contains the following provisions:

"*Depletion of mines, oil and gas wells, other natural deposits, and timber; depreciation of improvements.*

"(a) Section 23(m) provides that there shall be allowed as a deduction in computing net income in the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements. Section 114 prescribes the bases upon which depreciation and depletion are to be allowed.

"(b) Under such provisions, the owner of an economic interest in mineral deposits or standing timber is allowed annual depletion deductions. However, no depletion deduction shall be allowed the owner with respect to any timber or coal which such owner has disposed of under any form of contract by virtue of which he retains an economic interest in such timber or coal, if such disposal is considered a sale of timber or coal under section 117(k) (2). An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the severance and sale of the mineral or timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic inter-

est merely because, through a contractual relation to the owner, he possesses a mere economic advantage derived from production. Thus, an agreement between the owner of an economic interest and another entitling the latter to purchase the product upon production or to share in the net income derived from the interest of such owner does not convey a depletable economic interest."

In a number of cases in this and other circuits * the courts have been called on to decide the difficult question whether a taxpayer, who has no legal title to the mining area but has entered into a contract with the owner or lessee of the land to extract the mineral, has an economic interest in the mineral in place within the meaning of the regulation, entitling him to a share in the depletion allowance, or merely an economic advantage derived from the production contract without any interest in the mineral itself. It has been pointed out in these cases that frequently the landowner does not engage in the production of the mineral himself but enters into a production contract with an experienced operator; and in general it has been held, following the lead of the Supreme Court in Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062, that since depletion depends upon production, the determining factor in passing on the right to the deduction is not the legal title to the land but whether the producer is possessed of an *economic interest* in the mineral in place by acquiring the right to exploit the deposit, which is necessarily reduced as the material is extracted. On the other hand, it is generally held that the extraction of the mineral by the operator is not in itself the determining factor, for the operator

may be acting merely as an employee of the owner or an independent contractor to do the work for a specified price and hence acquires merely the *economic advantage* proceeding from the operation.

A number of circumstances under the varying facts of the decided cases have been considered important factors in concluding on which side of the line the transaction falls. Perhaps the most important is whether the producer has the right under the contract to exhaust the deposit to completion or is subject in this respect to the will of the owner through a provision in the agreement empowering the owner to terminate the contract at will. If the operator has the absolute and exclusive right under the contract to exhaust the deposit, it is usually held that he has an economic interest in the mineral which entitles him to a depletion allowance, but if the owner has the right under the contract to terminate the relationship at will, the operator is deemed to be an employee of the owner or an independent contractor compensated at a specified rate with no right to the deduction.

Other circumstances which have been considered relevant in deciding the question include the substantial investment usually made by the producer to procure the needed equipment and means of access to the work, which are often of little or no value when the work is done; and also the right to dispose of the coal after it is mined—whether it is to be sold by the miner or the landowner, and whether the producer's return is fixed by the terms of the contract or is dependent upon the state of the market.

In the present case the task of the court is made easy by a recent decision of the Supreme Court in Parsons v. Smith, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed. 2d 747 (approving the decision of the

* Commissioner of Internal Revenue v. Gregory Run Coal Co., 4 Cir., 212 F.2d 52, certiorari denied 348 U.S. 828, 75 S.Ct. 47, 99 L.Ed. 653; Weirton Ice & Coal Supply Co. v. Com'r, 4 Cir., 231 F.2d 531; Commissioner of Internal Revenue v. Hamill Coal Corp., 4 Cir., 239 F.2d 347;

Commissioner of Internal Revenue v. Mammoth Coal Co., 3 Cir., 229 F.2d 535, certiorari denied 352 U.S. 824, 77 S.Ct. 31, 1 L.Ed.2d 47; Usibelli v. Com'r, 9 Cir., 229 F.2d 539; Denise Coal Co. v. Com'r, 3 Cir., 271 F.2d 930.

Third Circuit at 255 F.2d 595, 599), which was handed down after the decision of the District Court below. The question involved and the essential circumstances of that case are so similar to those of the case at bar that we must accept the decision as controlling. The taxpayers, who were members of a co-partnership (Parsons) and were experienced in road building, entered into an oral contract with the owners of coal lands (Rockhill) in Pennsylvania to strip mine the coal within a certain area. Parsons was to furnish the equipment and labor necessary for the work and deliver the coal to Rockhill, for which it. was to be paid a stated sum per ton. Parsons was not authorized to keep or sell the coal but was required to deliver it all to Rockhill. The agreement did not cover a definite term or obligate Parsons to mine the tract to exhaustion but, on the contrary, provided that either party might terminate the arrangement on ten days' notice if it desired to quit. If Rockhill should cancel, Parsons would have the privilege of taking out and being paid for such coal as had been uncovered. The operations continued for sometime, whereupon Parsons gave notice and quit the work at a time when large amounts of coal still remained in the tract. Parsons's investment ranged from $60,000 to $250,000 during the period of the operation. The equipment was movable and there was no evidence that it was not usable for other purposes. The taxpayers contended that by their contract to mine the coal, and particularly by their contribution of equipment and organization, they, in legal effect, made a capital investment and acquired an economic interest in the mineral and were entitled to take a deduction for depletion. In answer to this contention, the Court said (359 U.S. at page 224, 79 S.Ct. at page 662, 3 L.Ed.2d 747):

"We take a different view. It stands admitted that before and apart from their contracts, petitioners had no investment or interest in the coal in place. Their asserted right to the deduction rests entirely

upon their contracts. Is there anything in those contracts to indicate that petitioners made a capital investment in, or acquired an economic interest in, the coal in place, as distinguished from the acquisition of a mere economic advantage to be derived from their mining operations? We think it is quite plain that there is not.

"By their contracts, which were completely terminable without cause on short notice, petitioners simply agreed to provide the equipment and do the work required to strip mine coal from designated lands of the landowners and to deliver the coal to the latter at stated points, and in full consideration for performance of that undertaking the landowners were to pay to petitioners a fixed sum per ton. Surely those agreements do not show or suggest that petitioners actually made any capital investment in the coal in place, or that the landowners were to or actually did in any way surrender to petitioners any part of their capital interest in the coal in place. Petitioners do not factually assert otherwise. Their claim to the contrary is based wholly upon an asserted legal fiction. As stated, they claim that their contractual right to mine coal from the designated lands and the use of their equipment, organizations and skills in doing so, should be regarded as the making of a capital investment in, and the acquisition of an economic interest in, the coal in place. But that fiction cannot be indulged here, for it is negated by the facts."

We find no material difference between the circumstances of the Parsons case and those of the case at bar. In both, the claim to a deduction rested upon the contract between the taxpayer and the owner under which the taxpayer agreed to furnish the equipment and mine and deliver the coal to the owner at a fixed price per ton; and the right of the taxpayers to carry on the operation was

completely subject to the will of the owner by reason of the right of the owner to cancel the contract at any time without cause on short notice. In view of the similarity of these essentials, the minor differences in the facts of the two cases do not distinguish them in the application of the statute.

The judgments of the District Court must therefore be reversed and the case remanded with direction to dismiss the complaints.

Reversed and remanded.