WILLIAM M. LEGG AND RACHEL FRANCES LEGG, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

FRED L. LEGG AND MERIDA L. LEGG, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 92543, 92544. Filed October 8, 1962.

*James C. Higgins, Esq.*, for the petitioners.
*Donald P. Krainess, Esq.*, for the respondent.

OPINION.

BRUCE, *Judge:* Respondent determined deficiencies in the income taxes of the petitioners as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 92543 | William M. Legg and Rachel Frances Legg | 1956 | $1,809.35 |
|  |  | 1957 | 8,958.67 |
| 92544 | Fred L. Legg and Merida Lee Legg | 1956 | 2,828.38 |
|  |  | 1957 | 10,323.12 |

The two cases were consolidated.

The only issue presented for our determination is whether petitioners, operating as a partnership, are entitled to depletion deductions in the years 1956 and 1957. All other adjustments determined by respondent in the notices of deficiency have been conceded by petitioners.

The facts have been stipulated and the stipulation, together with the exhibits attached thereto, is incorporated herein by reference.

William M. Legg and Rachel Frances Legg are husband and wife residing in Oak Hill, West Virginia. They filed joint income tax returns for 1956 and 1957 with the district director of internal revenue, Parkersburg, West Virginia. Fred L. Legg and Merida Lee Legg are husband and wife residing in Oak Hill, West Virginia. They filed joint income tax returns for 1956 and 1957 with the district director of internal revenue, Parkersburg, West Virginia. William M. Legg and Fred L. Legg will hereinafter sometimes be referred to by their first names or as petitioners.

On May 21, 1956, William and Fred formed a partnership to engage in the business of coal mining by both the auger method and stripping method. Partnership income tax returns for the years 1956 and 1957 were filed with the district director of internal revenue, Parkersburg, West Virginia.

On May 21, 1956, William entered into an agreement with Christian Colliery Company whereby William, as contractor, agreed to mine coal by auger method from various locations of a seam of coal known as the Eagle seam located near the village of Mahan in Fayette County, West Virginia. This agreement, omitting the signatures and acknowledgments, provided as follows:

THIS MEMORANDUM, Made this 21st day of May, 1956, by and between CHRISTIAN COLLIERY COMPANY, a corporation, party of the first part, hereinafter sometimes called "Company", and WILLIAM LEGG, party of the second part, hereinafter sometimes called "Contractor",

WHEREAS, the Company mines and produces coal from the Eagle Seam at its mining operation known as the No. 3, or Krebs mine, located near the village of Mahan, Fayette County, West Virginia, and

WHEREAS, the parties hereto desire to enter into an agreement, effective as of this date, under the terms and conditions of which the Contractor will mine coal, by auger methods, from the said Eagle Seam at various locations along that part of the Eagle Seam lying between the head house of the No. 3, or Krebs, tipple plant on the north, and the point where said Eagle Seam crop line intersects with Payne Spring Branch on the east, a distance of about 10,000 feet along said crop line, and haul the same to the dumping bin near said head house of the No. 3 tipple plant,

Now, THEREFORE, THIS CONTRACT, WITNESSETH:

1. That in consideration of the work to be done and the services to be rendered by the Contractor in mining and hauling said coal from the Eagle Seam, between the aforesaid points, and in consideration of the terms, conditions and promises

hereinafter set forth, to be kept and observed by the Contractor, the Company hereby agrees to pay the Contractor the sum of Three Dollars ($3.00) per net ton of Two thousand (2000) pounds, for each and every ton of merchantable coal mined from the bore holes located between the above described points, and delivered in the aforesaid dumping bin near the head house of the No. 3, or Krebs, tipple plant.

2. (a) It is expressly understood by and between the parties hereto that the coal produced and hauled by the Contractor shall be weighed at truck scales located near the aforesaid dumping bin, or in lieu of such scales, the weight of the coal shall be determined in the following manner, to-wit:

Upon the completion of each shift of work, it shall be the duty of the Contractor to immediately ascertain and make a written record, in duplicate, of the number of auger holes bored during that particular shift, and to measure the length of each auger hole bored on said shift. The contractor shall thereupon forthwith deliver one copy of such record to the Company at the company office at Mahan, West Virginia, and it shall thereupon become the joint duty of the parties hereto to accurately calculate, by methods generally approved and accepted by the mining industry, the weight or tonnage of said coal. In case any part of the coal produced on a particular shift is not clean or merchantable, or consists of cuttings from the floor or roof of the seam, the Contractor shall include as a part of the aforesaid memorandum a record of such unusable coal, and the parties hereto shall, together, make a fair estimate of the weight or tonnage of such unusable coal and deduct such estimated weight from the tonnage credit the Contractor is entitled to receive. Provided further, that at the option of the Company, the weight of the coal may be determined by railroad weights, the intents of the parties being that the Company shall pay the Contractor for the net tonnage of the coal actually shipped.

(b) The Contractor shall at all times load and dump into the aforesaid bin only coal which is clean and merchantable and which the Company will be able to sell to its customers, and the Contractor further agrees that it will not load nor dump coal which is dirty and not merchantable, including the cuttings from the floor or roof of the seam, and the Company shall have the absolute right to reject any coal mined by the Contractor which the Company deems to be of such poor quality that it cannot sell to its customers. Further, if after any coal, furnished by the Contractor hereunder, after being loaded in railroad cars and tested, is found to be so inferior in quality that the same is sold at a price that nets the Company less than Four Dollars ($4.00) per ton, then and only in such event, the amount per ton to be paid by the Company to the Contractor for each, any and every ton of coal produced and delivered, as provided by paragraph "1" hereinabove, shall be reduced by the amount that the net price, to the Company, is less than the said ($4.00) per ton.

(c) It shall be the duty of the Contractor to identify the holes bored on a particular shift by chalk markings or some other manner approved by the Company, so as to provide the Company with the opportunity of verifying the measurements and calculations upon which the tonnage is based.

3. The Company shall have the right at all times to inspect each and every part of the Contractor's operations, including its books and records, not only for the purpose of verifying the aforesaid measurements and calculations, but also in order to determine whether the Contractor is keeping and observing all of the other terms and conditions contained in this contract. The Contractor hereby agrees that he will deliver to the office of the Company at Mahan, West Virginia, immediately after each shift of work is completed, time sheets showing the time, overtime and rate of pay of each employee, duly signed and approved by both

the Contractor himself as well as by the employees whose time is being kept, and the Contractor agrees that he shall be bound by such time sheet entries and payments may be made safely and free of liability when made in accordance therewith, and the same shall be charged against any amounts then or thereafter due to the Contractor from the Company.

4. It is expressly understood and agreed by and between the parties hereto that the Contractor shall mine said coal only by the usual and approved methods in practice in the State of West Virginia with reference to the mining and removing of coal by auger methods, and further, the Contractor agrees that it will not interfere with any deep mining operations which may be conducted on the premises by the Company, it being recognized that the rights of the Company to conduct deep mining operations on the premises shall be deemed paramount and be permitted to proceed without let or hindrance from the operations of the Contractor.

5. It is expressly understood and agreed by and between the parties hereto that the legal title to the coal mined and hauled under this contract shall always remain in the Company.

6. The Contractor shall commit no avoidable damage or waste to the premises in the conduct of its operation.

7. The Contractor shall furnish its own personnel, both for the production and the haulage of the coal, as well also as all of the mining machinery, equipment, including motor trucks, and other apparatus necessary for the production and haulage of said coal, except as herein otherwise provided.

The Company hereby rents, leases and lets unto the Contractor a certain (the newer) D–8 Caterpillar Bulldozer, Serial No. _____, and the rental on the same shall be thirty-three Cents (33¢) per net ton of coal according to the railroad or other weight of the same as provided for hereinabove, and the term and period of said lease shall extend during the life of this contract, provided the Contractor is not in default either in the payment of the rental and keeps and observes the conditions of this contract. The Contractor shall supply the fuel and other supplies, equipment, material and tools necessary for the operation of said bulldozer and at all times during the life of said rental period keep and maintain the same in a good state of repair at his own expense, and shall restore the same to the Company, at the end of the lease in the same condition it is now in, ordinary wear and tear excepted. After the Contractor has paid no less than Fifteen Thousand Dollars ($15,000.00) by way of rental, he may, at his option, be entitled to purchase the same from the Company by the payment of the additional sum of Ten Thousand Dollars ($10,000.00) cash or on terms and conditions satisfactory to the Company. Further, all such employees shall be paid for their services by the Contractor, whose relationship with the Company shall be that of an independent contractor, and the Contractor shall be exclusively in charge and control as to the manner, means and methods under which the work and services contemplated by this contract are performed. The sole limitation to the provisions set forth hereinabove in this paragraph shall be that the Contractor shall employ competent and skilled workmen, and to that end it shall employ only workmen who are members of the United Mine Workers of America.

8. Should the Company, now or hereafter, as a convenience to the Contractor, or for any other reason, pay any taxes, social security or charges, assessments, Workmen's Compensation or insurance premiums, bulldozer rental, union dues, medical, hospital or doctor charges, vacation pay, or meet the payroll of the Contractor, or otherwise become obligated or pay any debt of the Contractor, it is understood between the parties that such expenditures shall be construed

to be at the request of the Contractor, and shall be for and upon its sole account, and as monies advanced at its request, and for its sole use and benefit, and the said expenditures shall become immediately due and payable, without demand being made, and the subject to offset against any monies due from the Company to the Contractor, but nothing herein shall be construed as creating any obligation on the part of the Company to pay any of the foregoing expressed obligations of the Contractor or any other of its obligations, incurred in the performance of its said contract.

9. The Contractor shall have the absolute right to terminate this contract at any time provided it has (1) given the company 30 days notice in writing of its intention to cancel; (2) kept and observed the terms and conditions herein contained as of the date of cancellation; (3) offered to surrender the premises without commission of damage or waste, except that necessarily unavoidable by reason of its operations; and (4) has fully complied with the provisions of Chapter 22, Article II-A, Code of West Virginia. The parties hereby agree that a reserve shall be created, in the amount of five cents (5¢) per ton, which reserve shall be retained by the Company until such time after the expiration of this contract as the Contractor has complied, in the opinion of the Department of Mines of the State of West Virginia, with all the requirements of law set forth in said Article 2-A, Chapter 22, West Virginia Code, and should the Contractor fail to comply with said requirements within 60 days after the expiration of this contract, the Contractor hereby authorizes and directs the Company, without further notice to the Contractor, to use so much of said reserve fund as may, in the sole discretion of the Company, be necessary to comply with said law. Should the Contractor abandon this contract, without complying with the stipulations set forth next hereinabove, in this paragraph, then any monies owed to it by the Company shall be treated as liquidated damages sustained by the Company by reason of such abandonment and, at its option, may be deemed forfeited and retained by the Company. And further, in case of a breach on the part of the Contractor of any of the terms and conditions herein set forth, the Contractor promises and agrees that it will upon demand of the Company, cease its operations and surrender the premises upon which they are being conducted without requiring the Company to resort to its remedies in law or equity.

10. The Company shall have the absolute right to terminate this contract without notice to the Contractor, provided however, upon exercising such right it shall reimburse the Contractor for the reasonable cost of the work developed or in progress as of the date of such cancellation, but in no case shall such reimbursement exceed the sum of One Thousand Dollars ($1,000.00), so that the cost of the development and progress of the work done under the contract in excess of said sum shall be deemed to have been performed at the sole risk of the Contractor.

11. The Contractor shall not assign or otherwise convey any of its rights or duties under this contract without first obtaining the consent in writing of the Company, provided, however, the Contractor shall have the right to make an assignment of all of its rights and duties hereunder to a corporation created under the laws of the State of West Virginia for the sole purpose of conducting the work contemplated by this contract, provided further, the majority of the voting capital stock, a quorum of the Board of Directors and the principal officers of said corporation shall consist of the individual parties of the second part to this contract.

12. It is expressly understood and agreed by and between the parties hereto that the Company shall not be responsible for work stoppages sustained by the Contractor, whether the same is due to lack of tipple facilities, market or any

other cause, nor shall the Company be responsible for any loss or damage sustained by the Contractor to his equipment from earth or rock slides or any other cause.

On July 10, 1956, William and Fred, as contractors, entered into an agreement with Christian Colliery Company, which, except for certain changes with respect to the rental and purchase of equipment and the addition of Fred as a contractor, contains essentially the same provisions as the earlier agreement.

On February 4, 1957, William and Fred entered into another agreement with Christian Colliery Company, the provisions of which, omitting the signatures and acknowledgments, are as follows:

This agreement, made this the 4th day of February, 1957, by and between Christian Colliery Company, a corporation, party of the first part, hereinafter called the company, and William Legg and Fred Legg, parties of the second part, hereinafter sometimes called contractor,

Whereas the company and the aforesaid William Legg entered into a contract under date of May 21, 1956, under the terms of which the said Legg became entitled to mine, by strip or auger method, a certain area of the Eagle seam of coal, the same being a part of the "Krebs" mine operation in Kanawha District, Fayette County, West Virginia, and whereas said agreement of May 21, 1956, was modified, amended and supplemented by a memorandum of agreement between the parties hereto, bearing date of the 10th day of July, 1956, and,

Whereas the parties hereto recognize that the above mentioned agreements of May 21, 1956, and July 10, 1956, do not clearly set forth the actual agreement and contract between the parties and that certain matters, which should have been expressed and set forth at length therein, were entirely or partially omitted when said contracts were reduced to writing, and,

Whereas the parties hereto desire to further provide, modify, amend and supplement said contracts so as to set forth more clearly the full intent of the two former mentioned agreements and, also, to express and recognize in writing several matters which were partly or entirely omitted in the provisions of said former contracts except, if at all, by implication.

Now THEREFORE, THIS AGREEMENT WITNESSETH:

1. That for and in consideration of the sum of Ten ($10.00) Dollars, cash in hand paid, the receipt of which is hereby acknowledged by each of the parties from the other, and in consideration of the terms, conditions and promises hereinafter set forth, the company agrees to pay the contractor, as has heretofore been the letter, spirit and practice of the agreements, a base price of Three ($3.00) Dollars per net ton of Two Thousand (2,000) pounds, said price to be subject to any change or revision, upward or downward, as the selling price may vary as a consequence of changes in prevailing wage contracts, quality of coal produced by the contractor or other reasons which affect the selling price of the coal, provided further, the contractor shall receive three-fifths (⅗) of any increase in the selling price of the coal and shall absorb three-fifths (⅗) of any decrease in the selling price of the coal, and, accordingly, the company hereby ratifies and confirms the increase of the amount paid per ton from Three ($3.00) Dollars to Three Dollars and fifteen cents ($3.15), that is to say, an increase (upon the base price of Three ($3.00) Dollars) of fifteen cents ($.15) per ton, recognized and allowed by the company to the contractor on October 1, 1956, by reason of increase in the prevailing wage agreement and corresponding increases in the price of coal.

2. The parties hereto hereby expressly recognize that the parties of the second part always have had a continuous economic interest in said strip and auger job operation at Krebs ever since its inception, and the continued existence of this joint adventure is subject only to the economics and success of said operation, all of which, including the respective material rights and duties, the parties intended to express but did not expressly include in said former contracts; and the company hereby recognizes and acknowledges that among other duties of the contractor not hereto expressed, but in the process of fulfillment by the contractor is that of extending the road ways and otherwise developing for future operation that area of the property lying, and being beyond, and east of the said Payne Spring Branch, it being the intent of the parties heretofore, as well as by this agreement, to provide a continuous strip and auger operation so far as the entire Krebs mine area, and the economics and success of the joint efforts of the parties will support such operation, and the company therefore further acknowledges and agrees that the area to be developed and worked by the contractor, by strip and auger methods only, shall include the entire Krebs or No. 3 mine area along the crop lines of not only the Eagle seam but also the Little Eagle, the Lower Powellton, upper Powellton, and lower No. 2 gas seams of coal, and that the preparation, exploration and development work heretofore done and hereafter to be done by the contractor in those areas not expressly included in the former agreements is hereby ratified, approved and confirmed by the company, provided further, that the contractor shall not be entitled to any consideration for such preparation, exploration and development work except that derived from the sale of the coal as expressly provided for hereinabove, and in the former contracts.

It is however understood and agreed by and between the parties hereto that except as expressly amended herein the provisions and stipulations of the above mentioned agreements of May 21, 1956, and July 10, 1956, shall remain in full force and effect.

The partnership constructed haulage roads along the crop line to connect to the State highway. It also developed and worked a new seam of coal designated as the "War Eagle" seam about 200 vertical feet below the Eagle seam and opened a test mine for deep mining in the "Little Eagle" seam and performed all the necessary preparation at its own expense.

In its returns for the years 1956 and 1957, the partnership reported income from mining under the contracts with Christian Colliery Company as follows:

|  | 1956 | 1957 |
|---|---|---|
| Gross income from mining | $160,145.96 | $375,403.67 |
| Mining expenses exclusive of depletion | 117,349.91 | 329,839.11 |
| Net income before depletion | 42,796.05 | 45,564.56 |
| Deduction for coal depletion | 16,014.60 | 22,782.28 |
| Net income from mining after depletion | 26,781.45 | 22,782.28 |

During the taxable year 1957 the following coal tonnage, price per ton received by Christian Colliery Company, and price per ton paid by Christian Colliery Company to the William M. Legg and Fred L.

Legg partnership was recorded in the books of Christian Colliery Company:

| Tons | Price received by Christian Colliery Co. | Price paid to partnership |
|---|---|---|
| 30,328.2 | $5.50 | $3.15 |
| 12,715.6 | 5.50 | 3.35 |
| 31,327.3 | 5.50 | 3.40 |
| 38,998.8 | 5.35 | 3.40 |

The partnership income returns for the taxable years 1956 and 1957 contain partnership balance sheets as follows:

Assets:

| | Dec. 31, 1956 | Dec. 31, 1957 |
|---|---|---|
| Cash | ---------- | $9,898.50 |
| Notes and accounts receivable | $11,059.79 | 216.10 |
| Buildings and other fixed depreciable assets | 171,413.98 | 226,819.09 |
| Less: Accumulated depreciation and amortization | 19,934.65 | 98,310.20 |
| Net | 151,479.33 | 128,508.89 |
| Other assets | ---------- | 6,047.23 |
| Total assets | 162,539.12 | 144,670.72 |

Liabilities and capital:

| | | |
|---|---|---|
| Accounts and notes payable | 129,113.70 | 98,702.28 |
| Accrued expenses | 2,812.83 | 3,215.45 |
| Partners' capital accounts | 30,612.59 | 42,752.99 |
| Total liabilities and capital | 162,539.12 | 144,670.72 |

In its returns for the years 1956 and 1957 the partnership claimed depreciation deductions on its itemized equipment in the total amounts of $19,934.65 and $78,375.55, respectively. Respondent disallowed the deductions claimed to the extent of $9,094.03 and $26,302.10, and such adjustments have been conceded as correct by petitioners.

With the exception of the purchase prices of the assets shown in the depreciation schedules attached to the partnership returns ($171,413.98 acquired in 1956 and $55,405.11 acquired in 1957), all expenditures made by the partnership were entered as expenses in the financial records of the partnership and were deducted as business expenses in the partnership income returns.

Petitioners did not have an economic interest in the coal in place which was mined by them under the contracts with Christian Colliery Company in 1956 and 1957.

The sole issue is whether petitioners, operating as a partnership, are entitled to deductions for depletion of coal deposits, mined by them under contract, for the taxable years 1956 and 1957, under the provi-

sions of sections 611 and 613 of the Internal Revenue Code of 1954. Section 611(a) provides that "In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate." Section 613(a) provides that "the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion)." Section 613(b)(4) provides that, in the case of coal, the percentage depletion rate is 10 percent.

It is well settled that to be entitled to a deduction for depletion a taxpayer must own an "economic interest" in the mineral deposit mined as distinguished from a mere economic or pecuniary advantage derived from production under a contractual relation to the owner of the resources. *Helvering* v. *Bankline Oil Co.*, 303 U.S. 362, 367; *Palmer* v. *Bender*, 287 U.S. 551, 557; *Commissioner* v. *Southwest Exploration Co.*, 350 U.S. 308, 314. See also Income Tax Regs., sec. 1.611–1(b)(1).

In the more recent case of *Parsons* v. *Smith*, 359 U.S. 215 (1959), decided concurrently with *Huss* v. *Smith*, in each of which coal strip miners, operating as a partnership under contract, were denied a depletion deduction, the Supreme Court stated:

By their contracts, which were completely terminable without cause on short notice, petitioners simply agreed to provide the equipment and do the work required to strip mine coal from designated lands of the landowners and to deliver the coal to the latter at stated points, and in full consideration for performance of that undertaking the landowners were to pay to petitioners a fixed sum per ton. Surely those agreements do not show or suggest that petitioners actually made any capital investment in the coal in place, or that the landowners were to or actually did in any way surrender to petitioners any part of their capital interest in the coal in place. * * *

The Supreme Court listed seven factors in support of its conclusion: (1) Petitioners' investments were in their equipment, all of which was movable—not in the coal in place; (2) their investments in equipment were recoverable through depreciation—not depletion; (3) the contracts were completely terminable without cause on short notice; (4) the landowners did not agree to surrender and did not actually surrender to petitioners any capital interest in the coal in place; (5) the coal at all times, even after it was mined, belonged entirely to the landowners, and petitioners could not sell or keep any of it but were

required to deliver all that they mined to the landowners; (6) petitioners were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered, which was to be in full compensation for the full performance of all work and for the furnishing of all labor and equipment required for the work; and (7) petitioners agreed to look only to the landowners for all sums to become due them under their contracts.

The facts in the instant case are closely analogous to those in the *Parsons* and *Huss* cases, and are therefore controlled by the Supreme Court's decision in those cases.

Petitioners' investments were in the equipment used in connection with the mining operations, all of which was movable, and the cost of which was recoverable through depreciation. All other expenditures of the partnership were entered as expenses in its financial records and were deducted as business expenses in the partnership income returns. Petitioners made no investment in the coal in place. Title to the coal remained in the company at all times and petitioners could not sell or keep any of it but were required to deliver all coal mined by them to the company. They also looked only to the company for payment of any sums due them under the contracts. These facts petitioners concede.

Petitioners argue, however, that the contracts under which they mined the coal were not subject to short-term cancellation by the company. In this connection they point to the language of the 1957 agreement stating that the parties "hereby expressly recognize that the parties of the second part always have had a continuous economic interest in said strip and auger job operation at Krebs ever since its inception, and the continued existence of this joint adventure is subject only to the economics and success of said operation." Not only is this language vague and ambiguous, but we find nothing therein, which, in our opinion, would prevent the company, any time it decided the "economics and success" of the operation justified it, from terminating the agreement. To be sure, under the terms of the agreements of May 21 and July 10, 1956, the company would have to reimburse petitioners for the reasonable cost of the work developed or in progress, not to exceed $1,000, but this would not prevent termination. The agreements of May 21 and July 10, 1956, provided for complete termination by either party—by the contractor on 30 days' notice and by the company without notice, and these provisions were not amended or changed by the agreement of February 4, 1957, but remained in full force and effect. It necessarily follows from the above also that petitioners did not have the right to mine the coal to exhaustion. Cf. *United States* v. *Stallard*, 273 F. 2d 847 (C.A. 4).

Petitioners further argue that the amounts to be paid them for the coal mined and delivered were not at a fixed sum per ton. The 1956 contracts provided for the payment to petitioners of $3 per ton for clean and merchantable coal, with reductions for coal found to be inferior or unmerchantable. By the contract of February 4, 1957, the $3 base price per ton was made subject to revision, upward or downward, as the selling price might vary due to "changes in prevailing wage contracts, quality of coal produced by the contractor or other reasons which affect the selling price of the coal." Petitioners were to receive three-fifths of any increase and absorb three-fifths of any decrease in the selling price of the coal. The 1957 agreement also recognized an increase to $3.15 per ton allegedly made on October 1, 1956, by reason of an increase in the prevailing wage agreement and corresponding increase in the price of coal. While the agreement of February 4, 1957, would thus appear to authorize revision of the contract price according to the variance in the selling price received by the company, it does not appear this was carried out in practice. The increase from $3 to $3.15 per ton, apparently made prior to the execution of the 1957 agreement, was due to the increase in labor wage scale. The reasons for the later increases to $3.35 and $3.40 per ton are not shown. It is evident they were not due to changes in the selling price received by the company. The stipulated facts show there was no change in the selling price ($5.50 per ton) received by the company when these increases in the amounts paid petitioners were made, nor was the amount paid petitioners decreased when the selling price dropped from $5.50 to $5.35 per ton. In *Parsons* the price paid the contractors could be raised in the event of an increase in the union wage scale, and was in fact raised on several occasions. In *United States* v. *Stallard, supra*, there was a finding that the price paid under the contracts varied from time to time, depending on the supply and demand and the prices available on the market. In each of these cases it was held that the contractors (strippers) did not own an economic interest in the coal in place. See also *Denise Coal Co.* v. *Commissioner*, 271 F. 2d 930 (C.A. 3, 1959), reversing in part 29 T.C. 528, decided prior to the Supreme Court decision in *Parsons*. In the *Stallard* case, the Fourth Circuit Court of Appeals discussed various circumstances which had been considered as important factors in previous decided cases and stated, "Perhaps the most important is whether the producer has the right under the contract to exhaust the deposit to completion or is subject in this respect to the will of the owner through a provision in the agreement empowering the owner to terminate the contract * * *."

The provisions in the agreement of February 4, 1957, permitting variance in the prices paid petitioners, even if they had been observed, are considered of minor consequence, considering the similarities of

other essentials deemed important in *Parsons* and *Stallard*, and are not sufficient, in and of themselves, to give the petitioners an "economic interest" in the coal deposits here involved. See also *Walter Bernard McCall*, 37 T.C. 674.

Nor do we find any merit in petitioners contention that the agreements here in question were leases and that they were entitled to an apportionment of depletion under section 611(b)(1) of the Internal Revenue Code of 1954. The short answer to this is that the agreements were not leases by any stretch of the imagination. Moreover, the cancellation clauses contained in the 1956 agreements and continued in force by the 1957 agreement are inconsistent with any argument that petitioners obtained or had a leasehold interest in the coal in place. *J. Shelton Bolling*, 37 T.C. 754.

Petitioners' reliance on the statement contained in the agreement of February 4, 1957, that "the parties recognize" that petitioners "always have had a continuous economic interest in said strip and auger job operation at Krebs ever since its inception," and upon the fact that the Christian Colliery Company may not have claimed all the depletion allowance to which it might have been entitled, as evidencing they had a right to apportionment of the depletion, is likewise of little merit. The statement not only does not purport to convey or transfer any interest in the coal in place, but it is obviously too vague, indefinite, and uncertain to do so. Since it does not purport to change or amend the previous agreements, as an expression of the understanding of the parties, in addition to being imprecise and ambiguous, it is of no consequence so far as the incidence of taxation herein is concerned. We are controlled by the terms and legal effect of the agreements of May 21 and July 10, 1956, which are clear and precise, and not with the understanding of the parties. See *Pugh* v. *Commissioner*, 49 F. 2d 76, 79, wherein the Fifth Circuit stated:

The proposal is to give this recorded instrument an effect according to the wish of the parties rather than that attributable to it by law, and thus to control as against the United States the application of the tax laws. * * * That by some other form of instrument the rights of the United States would have been different is beside the question. The parties abide by this instrument as they made it. The law, and not their wish or understanding, must control its legal effect on the incidence of taxation. The Board did not err in disregarding the parol evidence.

The tax liability of the Christian Colliery Company is not at issue herein and whether or not it claimed all the depletion to which it might have been entitled is immaterial.

We hold, under all the facts and circumstances presented herein, that petitioners are not entitled to deductions for depletion for the taxable years 1956 and 1957.

Reviewed by the Court.

*Decisions will be entered for the respondent.*