W. P. Ison and Lucille Ison v. Commissioner.
Ison v. Commissioner
Docket No. 154-62.
United States Tax Court
T.C. Memo 1963-308; 1963 Tax Ct. Memo LEXIS 37; 22 T.C.M. (CCH) 1620; T.C.M. (RIA) 63308; November 21, 1963
Carl E. McAfee, Norton, Va., for the petitioners. Conley G. Wilkerson, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined a deficiency of $1,380.12 in petitioners' income tax liability for 1957. This deficiency results from the following adjustments to petitioners' income: (1) The disallowance of a "depletion deduction claimed in the amount of $4,543.15 from the operation of a coal mine leased from New York Mining and Manufacturing Company," and (2) the increase of petitioners' income "by the amount of $2,388.29 to reflect the partnership income from Critical Fork Coal Company as shown in the amended partnership return filed on May 27, 1958." The latter amount was computed by subtracting petitioner W. P. Ison's one-third share of the partnership loss shown on *38 the amended partnership return ($943.51) from the distributions shown on the amended partnership return as having been made to petitioner W. P. Ison in the amount of $1,898.86 (an amount not returned by petitioners as income), and adding to the result ($955.35) the sum of $1,432.94 which was petitioner W. P. Ison's one-third share of the partnership loss as shown on the partnership's original return, and which was shown as a deduction in petitioners' return for the taxable year. Petitioners' original petition stated that the entire amount of the deficiency was at issue but alleged specific error only as to the disallowance of the depletion deduction. At the time of trial petitioner orally amended the petition (which amendment was later reduced to writing in the form of an amended petition filed by the leave of the Court 7 days after the trial) to specifically allege an additional error as follows: "The notice of deficiency erroneously considered as income unto the Petitioners the sum of $1,898.32 by reason of cash received by the Petitioner, W. P. Ison, from the partnership of Critical Fork Coal Company during the year 1957 which $1,898.32 was payment unto the Petitioner, W. P. Ison *39 of equipment sold unto the partnership." By an amended answer to the amended petition respondent makes claim under section 6214(a) of the Internal Revenue Code of 1954 for an increased deficiency in income tax due from petitioners for 1957 in the amount of $874.45, making the total amount of the deficiency now claimed by respondent the sum of $2,254.57. This total deficiency is computed by respondent by making the following adjustments to petitioners' income: Respondent has accepted the testimony of W. P. Ison to the effect that the payment to him of the sum of $1,898.86 by the partnership Critical Fork Coal Company in 1957 was not a distribution to him as "Payments to partners - salaries and interest," but constituted payments to him on account of mining machinery and equipment sold by him to the partnership in May 1957. As such this payment constituted a capital expenditure by the partnership and was not deductible from the partnership's gross income. The partnership erroneously deducted the amount of such payment (in the amount of $1,898.86) from its gross income in its amended return for 1957. Without such erroneous deduction the loss of the partnership *40 was properly $931.67 in lieu of $2,830.53. W. P. Ison's one-third share of the proper loss figure was $310.55 in lieu of the $1,432.94 deducted by him on petitioners' personal return for that year. Therefore, the adjustment to petitioners' taxable income for 1957 on account of partnership income should have been an increase of $1,122.39 ($1,432.94 less $310.55) instead of the increase of $2,388.29 made in respondent's original determination of deficiency. Accordingly, respondent decreased the item of adjustment on account of "partnership income" in the amount of $1,265.90. However, respondent alleges in his amended answer that since petitioner sold mining machinery and equipment to the partnership during the taxable year for a price which was in excess of its depreciated cost as of the first of the year, petitioners are not entitled to a deduction for depreciation thereon during the taxable year and therefore alleges that "their adjusted gross income should be increased by the amount of $4,681.21, the depreciation claimed in this year." Therefore, the net increase in petitioners' taxable income over that originally determined by respondent, which is now alleged by respondent to be *41 correct, is the sum of $3,415.31 ($4,681.21 minus $1,265.90) with a resultant additional deficiency in petitioners' income tax liability of $874.45. Findings of Fact Some of the facts were stipulated and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein and made a part of our Findings by this reference. Petitioners, who are husband and wife, resided during the year 1957 in Pound, Virginia, and filed their joint Federal income tax return for that year with the district director of internal revenue at Richmond, Virginia. Since the taxable income reported therein was that of W. P. Ison, he will occasionally be referred to herein as "petitioner." In this return petitioners deducted as a loss of a partnership called Critical Fork Coal Company, hereinafter sometimes referred to as "the partnership," the sum of $1,432.94. Petitioner and two other individuals were equal partners in this partnership. The original partnership return filed for 1957 reported a loss of $4,298.82, one-third of which was $1,432.94, the amount deducted by petitioners. An amended return, prepared by a certified public accountant, was later filed by the partnership *42 which reported a loss of $2,830.53. In computing this loss the partnership deducted the sum of $3,398.86 as "Payments to partners - salaries and interest." Of this amount the sum of $1,898.86 was shown as a payment to petitioner. The amended partnership return also contained a deduction on account of depreciation of certain assets. One of these assets was shown as "Mine equipment" acquired on July 1, 1957, at a cost of $15,000. Both of these items of deduction will be referred to again later in these Findings. In petitioners' return for 1957 a deduction of $4,543.15 was taken on account of "Depletion of mines, oil and gas wells, timber, etc.," and also a deduction of $4,681.21 on account of "Depreciation." The assets upon which this depreciation was taken consisted of three items of "Mine Equipment" for which the total cost was recited to be $16,489.92, and depreciation allowed or allowable in prior years to be in the total amount of $6,526.33, a "Diesel Plant" for which the cost was recited to be $5,100 and depreciation allowed or allowable in prior years to be $850, and a "Chevrolet Pickup" for which the cost was recited to be $1,816.16 and the depreciation allowed or allowable *43 in prior years to be $1,089.69. Depreciation was calculated on these items under the straight-line method by taking 20 percent of cost without any consideration or mention of the salvage value of the assets depreciated. These assets upon which depreciation deductions were claimed will be referred to again later in these Findings. Petitioner was, and had been since 1946, a coal operator. On or about September 5, 1955, petitioner, as lessee, entered into a "COAL LEASE" with the New York Mining and Manufacturing Company, as lessor. This lease provided as follows: That for and in consideration of the payments to be made by the Lessee to the Lessor, as hereinafter provided, and of the covenants and conditions to be performed, the Lessor does, by these presents, lease and let unto the Lessee, subject to all of the terms hereof, so much of what is known as the Upper Bench Clintwood seam of coal, in, under and upon the Lessor's… tract, in Wise County, Virginia, the area leased and the exterior lines thereof shall be such as the Lessor's Engineers may from time to time, in their sole judgment, assign to said Lessee, which area may be enlarged and/or decreased from time to time, together *44 with such mining rights and privileges only for the mining and removal of the coal as are now vested in the Lessor by its title papers of record in said county. Subject to all of the terms hereof, this lease is to continue in force until all the merchantable and mineable coal is mined and removed from the area assigned to the Lessee, unless sooner terminated as herein provided. In event the Lessee concludes that it cannot operate the property profitably, it has the right to terminate this lease upon sixty (60) days written notice. THE LESSEE COVENANTS AS FOLLOWS: (1) To be careful in the use of fire in or near the woodlands, drifts, coal opening, slate dumps and improvements within or near the leased premises; and especially to so handle and dispose of waste from the mines as not to expose the coal seam or seams to fire damages in event the slate and waste dumps shall now or later become ignited. Should fire threaten at any time the Lessee shall promptly take steps to combat the same and notify the Lessor, or its duly authorized agents; (2) To guard and protect from injury or trepasss all openings made upon the premises during the life of this least, whether or not in actual *45 operation; and generally, to so handle the leased premises during the term hereof as to safeguard the interests of all concerned; (3) To drive all main entries, rooms and other parts of the mine in a work-manlike manner, according to the rules of good and customary mining and strictly in keeping with the requirements of the Lessor's mining engineers; it being understood that the Lessor, at its election, will do or have done by its engineering department such mine engineering and such mine mapping hereunder as it may consider necessary for the proper development of the mine covered by this lease, including the giving of measurements and directions for the turning of rooms, entries, headings, etc. and the placing of centers therein; (4) To keep accurate accounts and records of all coal produced upon or removed from said premises; and to afford the Lessor or its agents access to such accounts and records whenever so requested; (5) To pay Lessor for all coal produced upon or removed from said premises at the rate of thirty (30") cents per ton for each and every ton of two thousand (2,000) pounds thereof so produced and removed - according to actual weights, and all statements of *46 the tonnage rendered Lessor, to be verified by affidavit of the Lessee; all royalties to be paid either to the Lessor, or its duly authorized agents, not later than the fifteenth of each month for all coal mined during the preceding month; (6) To operate leased premises with diligence and as continuously as market and other conditions may reasonably justify, allowance being made for interruptions by strikes, lockouts and other hindrances ordinarily regarded as beyond the control of the Lessee; (7) The Lessee shall so conduct its operations hereunder as not to violate any rights of lateral or subjacent support of the surface belonging to persons other than the parties hereto; and to mine said coal and carry on all incidental work, in all respects, at the Lessee's own cost and risk as an independent contractor; the Lessor to be in no wise liable to any employees of the Lessee, nor any other person or persons, nor for damage resulting from the Lessee's operations, directly or indirectly, on or off of the leased premises, to persons or property; it being fully understood that the Lessor has and retains no control, supervision or authority over the Lessee's employees or other persons, *47 and the Lessee shall and does assume all responsibility, and if there shall arise any question of damage to the surface of the lands affected by this lease, which may not be owned by the Lessor, or pertaining to any other interest or estate, in such case the Lessee hereunder shall and does assume all responsibility therefor without claim upon the Lessor except for its assistance and support in the proper defense of all mining rights covered by its title, the Lessee bearing all costs and expense, legal and otherwise connected therewith; (8) To protect the mines and entries, haulways, rooms and working places in the mines by sufficient and necessary timbering; no pillars to be removed by the Lessee without the written permission of the Lessor first had, but in event the Lessor grants permission to remove pillars from the mines, this is not to be done except under plans furnished by the Lessor's engineers; (9) To pay all local and state taxes, or other taxes, lawfully assessed during the life of this lease, upon or against the Lessee's plant and improvements, machinery, tools, etc.; (10) In the event the Lessor desires to purchase from the Lessee all the coal, or any portion thereof, *48 which is produced by the Lessee under the terms of this lease, the Lessor may instruct the Lessee to deliver such coal to any ramp, loading dock, or tipple upon its premises or premises leased by the Wise Coal and Coke Company, for loading into railroad equipment or for such other disposition as the Lessor may elect. If the Lessor does so instruct the Lessee when it shall waive the provisions of Paragraph 5 as they may apply to coal so delivered in accordance with Lessor's instructions, and shall collect from the party or parties who purchase coal from the Lessee its applicable royalties for such purchased coal. The Lessor agrees that in the use of this right to purchase the Lessee's coal, or to have it purchased by other parties, it will at all times undertake to insure that the Lessee is given a fair and reasonable price for his product, bearing in mind the quality of coal produced and the competitive price situation at that time, less the applicable royalties, necessary selling costs, and processing costs. At the election of the Lessor, and notwithstanding anything to the contrary contained herein, the said Lessor reserves the right by serving a sixty (60) day notice upon the *49 Lessee, to unconditionally cancel this lease for reasons of its own, that in its judgment may warrant that course; and in such event this lease shall stand absolutely and incontrovertibly terminated and the Lessee, on notice either of termination or forfeiture, hereby agrees promptly to vacate the leased premises, and in event Lessee shall fail to do so, hereby authorizes the Lessor to enter upon and take possession thereof without resort to any legal process whatsoever. But the Lessee, if in no wise in default hereunder, upon the termination of this lease may remove from the premises owned by the Lessor, any and all improvements placed thereon by them, except the underground timbers and supports, provided this be done within thirty (30) days from such termination, but, if in default, such improvements are to pass to and become the absolute property of the Lessor, free from any claim of said Lessee. The area assigned to petitioner for his operations under this lease had been previously assigned to another operator. After he had driven two openings back about 500 feet, a fire destroyed his equipment and he decided to abandon the enterprise. Petitioner constructed a tipple, a motor *50 barn, and a supply house near the mine openings, and commenced mining operations sometime prior to 1956, using a motor generator set, two cutting machines, two battery-powered, rubber-tired locomotives, eight mine cars, various small equipment, and a diesel unit. Some of this equipment he already owned and some he bought for use in this operation. These operating assets (in addition to the "Chevrolet Pickup") were those upon which he claimed depreciation deductions in his return for the taxable year. In carrying on his excavations under this mining lease petitioner left large pillars of coal intact as he drove in his shaft, which pillars served as supports for the roof of the mine. It was petitioner's intent, and the usual practice in such mining operations, to go forward with the driving of the mine shaft as far as possible, and then as the equipment was withdrawn to remove the coal which had been permitted to remain in the pillars. This part of the mining operation is known as "pulling the pillars," and is accomplished faster than driving the mine forward. By January 1, 1957, petitioner had been confronted by conditions which made it impossible for him to drive the mine any further *51 forward, and he began the phase of the mining operation known as "pulling the pillars." This was completed in May 1957, at which time petitioner's mining operations under the lease here in question were ended. Petitioner employed 12 men in working this mine. In 1957 they worked one 8-hour shift, 40 hours a week. On this basis it took petitioner 90 working days to pull the pillars in this mine in 1957. It is petitioner's opinion that if he had doubled the number of his employees and worked them in two shifts he could have finished this mining operation by working 45 days in 1957. All but a negligible amount of the coal produced by petitioner from his operations under this mining lease was sold by him to the Wise Coal and Coke Company pursuant to section 10 of the above-quoted mining lease at prices made known to petitioner before delivery which fluctuated in small amounts but which "averaged around $3.45 to $3.50"a ton subject to downward adjustments on account of ash content, moisture, or other undesirable quality which might adversely affect the grade of the coal produced by petitioner. After his sale of the coal to the Wise Coal and Coke Company, petitioner had no further interest *52 in the coal thus sold or in the proceeds of any subsequent disposition of it by the Wise Coal and Coke Company. Since the loading dock of the latter company was located at a much shorter distance from petitioner's mining operation than that of any other coal company plant and the cost of haulage was consequently much less, petitioner would have sold and did sell the coal produced by him to the Wise Coal and Coke Company, even without specific directions to do so by his lessor. Engineering services for petitioner's mining operations under this lease were provided by the Wise Coal and Coke Company. Petitioner computed the depletion deduction taken by him in the taxable year 1957 with reference to the proceeds of the coal produced under his lease from the New York Mining and Manufacturing Company. In May 1957 petitioner joined with Harold Hibbitts and Alfred Fleming in forming a partnership known as Critical Fork Coal Company for the purpose of carrying on coal mining operations under a lease from Steinman-Velt Company. There was no written partnership agreement. Petitioner, Hibbitts, and Fleming were equal partners and each contributed $10,000 in cash to the partnership. Petitioner *53 agreed to sell to the partnership and the partnership agreed to buy all of the mining equipment which petitioner had used in his mining operation under the lease from the New York Mining and Manufacturing Company, including all of the assets, except the "Chevrolet Pickup," upon which he claimed depreciation deductions in his personal income tax return for 1957. The partnership agreed to pay him $15,000 for this equipment over a period of 3 years and, in addition, to pay an obligation which he owed to a bank in connection with the purchase of one piece of equipment in the amount of $398.86. Pursuant to this agreement petitioner sold these assets to the partnership shortly after May 1957, and the partnership paid the obligation of petitioner to the bank and also paid him directly on account of the purchase price the sum of $1,500, both payments being made in the taxable year. The amended partnership return for 1957 showed in the balance sheets contained therein that as of the end of the year it had assets in the amount of $64,595.06, liabilities in the amount of $36,857.27, and "Partners' capital accounts" in the amount of $27,737.79. It also reported distributions to petitioner in *54 the amount of $1,898.86. Among the assets upon which the partnership claimed depreciation deductions was an item referred to as "Mine equipment" shown as acquired on July 1, 1957, at a cost of $15,000. In 1958 petitioner, Hibbitts, and Fleming ceased to operate as a partnership and organized a corporation which took over the operations, assets, and liabilities of the partnership. Among the assets were those sold by petitioner to the partnership in 1957. By agreement of the three individuals, who were equal shareholders of the corporation, the corporation ignored the payment of $1,500 made to petitioner by the partnership in 1957 as a part of the purchase price of the assets sold by petitioner, and gave to petitioner its notes in the total principal face amount of $15,000 in satisfaction of the partnership's obligation to petitioner arising from the sale to the partnership of petitioner's mining equipment. At some subsequent time, not disclosed in the record, the operations of the corporation became unprofitable due to labor trouble, liens were placed upon the mining equipment by the corporation which were ultimately foreclosed, and the notes issued to petitioner by the corporation *55 were not paid. Opinion KERN, Judge: The first issue in this case is whether the petitioner, by reason of his lease agreement with the New York Mining and Manufacturing Company and his activities thereunder, obtained and held during the taxable year such an economic interest in the coal in place subject to his operations under the lease as to permit the depletion deduction claimed by him in his return for that year and disallowed by respondent. We decide this issue in favor of respondent. See Parsons v. Smith, 359 U.S. 215; United States v. Stallard, 273 F. 2d 847; J. Shelton Bolling, 37 T.C. 754; William M. Legg, 39 T.C. 30; and Raymond E. Cooper, 39 T.C. 253, on appeal (C.A. 4, Aug. 7, 1963). Although petitioner did not file a brief, we gather from the pleadings and from the statements of petitioner's counsel at the trial Herein that his principal contention on this point is to the effect that the right of termination reserved by the lessor, which is considered an important factor in the cited cases, should be disregarded in the instant case because the right was conditioned on the giving of 60 days' notice and *56 by the beginning of the taxable year petitioner's operations under the lease had progressed to the point where all of the minable coal remaining in the leased area could have been removed by him in less than 60 days if he had doubled his working force. In effect, petitioner argues that in all cases of leases such as this, which are subject to the lessor's right of termination upon the giving of a certain period's notice, when a moment comes after which the coal or other mineral may possibly be extracted within the period of the notice, the lessee's right to the coal is instantly transformed from a mere economic advantage into a depletable economic interest. We cannot agree with a contention which leads to such a bizarre and impractical result. The ultimate question in these cases is the intention of the parties with regard to the rights intended to be created by the lease contract. One factor, and an important one, in a determination of such intention as of the time of the execution of the lease, is the retention by the lessor, as a part of the lease agreement, of the right to terminate the lease at will. In our opinion the fact that a reasonable notice was required of the lessor before *57 the termination became effective does not render this factor inoperative and does not tend to a conclusion that the parties intended at the time the lease was executed that during the period prescribed for the notice the lessee should have a depletable economic interest rather than an economic advantage. We turn now to a consideration of the question involving the right of petitioner to claim a deduction for depreciation on certain mining equipment sold by petitioner to a partnership during the taxable year. This issue was injected into the case as a direct result of an amendment of the petition over the objection of respondent at the time of the trial herein, which was embodied in an amended petition filed immediately thereafter. Thereby the petitioner alleged for the first time that the payments made by the partnership in the taxable year to him or on his behalf were not distributions of partnership earnings but were payments made to him on the sale by him during the taxable year of certain capital assets to the partnership. These allegations were substantiated by petitioner's uncontradicted testimony. Thereupon the question of whether petitioner was entitled to deduct in the taxable *58 year depreciation on the assets thus sold by him became immediately pertinent. Respondent in his amended answer alleged that he was not entitled to such a deduction, and further alleged that the payments made to him for these assets were not deductible by the partnership in computing its loss for the taxable year. Accordingly, respondent makes claim to an increased deficiency. In his reply to respondent's amended answer petitioner contends that respondent is precluded from thus raising an issue which was not referred to in his original notice of deficiency. This contention is utterly without merit. Under the circumstances it would be contrary to justice and fairness to deny to respondent the right to raise a question which was logically inherent in an issue which petitioner himself was permitted to raise, over respondent's objection, by an amendment to the petition made at or after the hearing herein, and which is predicated on petitioner's own testimony and exhibits. Moreover, respondent's right to raise this question is obviously within the intendment of section 6214(a) of the Revenue Code of 1954. The facts show that when petitioner finished his own individual mining operations *59 in the taxable year he sold a large part of his mining equipment to a partnership engaged in a different mining operation at a price in excess of his cost basis less depreciation taken by him thereon in prior years, such depreciation being computed by him with no consideration of or reference to any salvage value. Under these circumstances petitioner is not entitled to a depreciation deduction thereon for the taxable year. Cohn v. United States, 259 F. 2d 371; Edward V. Lane, 37 T.C. 188; Randolph D. Rouse, 39 T.C. 70. Two recent cases, Motorlease Corporation v. United States, 215 F. Supp. 356, and S & A Co. v. United States, 218 F. Supp. 677, appear to differ from the cited cases. However, it is not necessary for us to express here our approval or disapproval of those two cases since they are distinguishable from the instant case in that here the petitioner sold assets which had ceased to be useful to him in the conduct of the business (his own individual mining operations) for which they had been held or acquired, and depreciation thereon had been computed and allowed without any consideration of or reference to their *60 salvage value. From the uncontradicted testimony of petitioner and the exhibits introduced in evidence, it is apparent that the payments in the amount of $1,898.86 made by the partnership in the taxable year to petitioner or on his behalf were for the acquisition of capital assets and were not deductible from the partnership's gross income. It follows that the loss of the partnership for the year 1957 was in the amount of $931.67 instead of $2,830.53 as shown in its amended return for that year, and that petitioner's deductible one-third share thereof was the sum of $310.55. We conclude: (1) That petitioner is not entitled to a depletion deduction claimed by him in the amount of $4,543.15, (2) that petitioner is not entitled to a deduction on account of depreciation of the mining equipment sold by him to the partnership in the taxable year, and (3) that petitioner's deductible partnership loss was in the amount of $310.55. However, respondent is in error as to the amount of the depreciation deduction properly to be disallowed. Petitioner did not sell the "Chevrolet Pickup" to the partnership and is, therefore, entitled to the depreciation claimed thereon in the sum of $363.23. *61 Accordingly. Decision will be entered under Rule 50.