Pennweir Construction Company v. Commissioner.
Pennweir Constr. Co. v. Commissioner
Docket No. 57538.
United States Tax Court
T.C. Memo 1959-90; 1959 Tax Ct. Memo LEXIS 163; 18 T.C.M. (CCH) 414; T.C.M. (RIA) 59090; April 30, 1959
*163 Robert P. Smith, Esq., and Dorothea Baker, Esq., for the petitioner. W. R. Musgrove, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax of the petitioner for the years 1950 and 1951 in the amounts of $17,514.89 and $30,525.75. The only issue presented is whether the petitioner is entitle to take percentage depletion deductions for 1950 and 1951 from its gross income from strip-mining operations, conducted under an agreement with the owner of the coal. Findings of Fact The petitioner, a Pennsylvania corporation, was organized on or about January 1, 1950, to take over the strip-mining operations which had previously been conducted by the Weirton Ice and Coal Supply Company under an agreement with National Steel Corporation dated February 20, 1941. The petitioner's income tax returns for 1950 and 1951 were filed with the collector of internal revenue for the district of West Virginia. Weirton Ice and Coal Supply Company, hereinafter referred to as Weirton, had been engaged in the coal business and owned two tracts of coal lands in Hanover Township, Washington County, Pennsylvania. It *164 appointed Miche Starvaggi its agent on February 26, 1939, and authorized him to negotiate with National Steel Corporation, hereinafter referred to as National, and others with respect to coal lands. Starvaggi entered into an agreement with National on February 20, 1941, on behalf of Weirton and in that agreement was referred to as the contractor. The following paragraphs are from the agreement: "WHEREAS National owns two tracts of coal lands, suitable for stripping operations, situated in Hanover Township, Washington County, Pennsylvania, said tracts being described in two certain deeds from Miche Starvaggi to National, dated the 20th day of February, 1941, and expects to acquire other adjoining tracts; and "WHEREAS the Contractor is willing to undertake to mine and remove quantities of coal for the use of National from the tracts acquired and to be acquired, to grade and clean such coal and to transport the same to National's steel plants at Weirton, West Virginia; "NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the respective parties hereto, each intending to be bound hereby, agree as follows: "1. The Contractor *165 will mine and remove from National's coal lands hereinbefore described such quantities of coal as National may, from time to time, direct and will deliver the same by truck to National's coal docks at Weirton, West Virginia. The coal so mined and delivered shall be properly cleaned by the Contractor and shall be of such sizes as National shall from time to time specify. "2. As consideration for the services to be performed by the Contractor pursuant to this agreement, National will pay to said Contractor a sum equivalent to One Dollar and Ten Cents ($1.10) for each net ton of coal so mined and delivered, payments to be made on or before the 20th day of each month upon the basis of the tonnage delivered by said Contractor to National's coal docks during the preceding month. * * *
"7. The consideration specified in paragraph 2 of this agreement is computed upon the basis of an average labor cost to the Contractor, as follows: "(a) Common or semi-skilled labor - 50" to 60" an hour. "(b) Skilled labor - $1.25 an hour. "(c) Supervisory salaries - $175.00 to $300.00 a month. "If, during the existence of this agreement, there shall be any material decrease or increase in *166 the Contractor's average labor rates, as hereinbefore set forth, the Contractor will forthwith give National written notice thereof, and thereupon the consideration specified in paragraph 2 shall be adjusted by mutual agreement to reflect such decrease or increase. If the parties are unable to agree upon the proper amount of the adjustment within thirty (30) days after such notice, this agreement shall thereupon cease and determine, without any further act of the parties. "This agreement shall remain in full force and effect until either National or the Contractor shall elect to terminate it by giving ninety (90) days' written notice of such election to the other party." National, on December 14, 1949, entered into an "indenture" with Weirton bearing the date of May 31, 1945, whereby National conveyed to Weirton all of the lands mentioned in the agreement of February 20, 1941, but reserving to itself the oil, gas and coal rights. One of the conditions of that conveyance was that the petitioner would relieve National of all obligations under the Pennsylvania statutes to restore, reforest, or replant the lands where open pit mining operations had taken place. Weirton, on January 10, 1950, assigned *167 to the petitioner the agreement of February 20, 1941, between Starvaggi, as agent for Weirton, and National. Weirton notified National of that assignment and National confirmed and ratified the assignment ab initio on February 1, 1954. The petitioner thereafter carried on the strip-mining operations under the February 20, 1941 agreement. It used the same personnel and equipment which Weirton had used, renting the equipment from Weirton. The petitioner purchased some additional equipment for use in the operation. The petitioner performed all of the obligations of the contractor under the contract of February 20, 1941, and made its billings directly to National. The officers of the petitioner and those of Weirton were the same individuals. Neither Weirton nor National gave any directions or interfered in any way with the operations carried on by the petitioner under the contract of February 20, 1941. The petitioner mined and delivered to National 212,235.30 tons in 1950, and 232,026 tons in 1951. The price of coal delivered by the petitioner to National for the period January 1 to February 28, 1950, was $2,9675 per ton, and for the period March 1 to December 31, 1950, was $3.1375 *168 per ton. For the month of January 1951 the price was $3.1375 per ton, and from February 1 to December 31, 1951, was $3.40 per ton. The gross receipts, operating costs (exclusive of percentage depletion), net income before depletion, and the 50 per cent limitation for the years 1950 and 1951, are set forth in the following schedule: 1950
1951
Gross receipts
$604,647.75
$715,167.93
Operating costs
536,393.20
639,437.85
Net income
$ 68,054.73
$ 75,730.08
50% limitation
34,027.37
37,864.04
The 50 per cent limitation exceeded the 5 per cent of gross receipts in 1950, and the 10 per cent of gross receipts in 1951, less delivery charges. The Commissioner, in determining the deficiencies, disallowed depletion deductions of $30,232.39 for 1950 and $38,038.32 for 1951 with the statement that the petitioner was not entitled to any allowance for percentage depletion within the intendment of sections 23(m) and 114(b)(4) of the Internal Revenue Code of 1939. Opinion LEMIRE, Judge: The Supreme Court of the United States has recently considered the very question involved in the present case. Parsons, et al. v. Smith, 359 U.S. 215 (April 6, 1959). *169 The holding in that case was that coal stripping contractors are not entitled to percentage depletion because they have no capital investment or economic interest in the coal in place where their contracts are terminable on short notice without cause and merely require the contractors to provide the equipment, do the work of strip-mining at fixed prices to the owner of the coal and deliver all of the coal mined to the owner of the coal. The facts in the present case are similar to the facts in the above-cited case and are not distinguishable in principle. Therefore, the only issue in the present case must be decided against the petitioner on the authority of that case. Decision will be entered for the respondent.