**TIDEWATER OIL COMPANY**
**v.**
**The UNITED STATES.**
**No. 30-61.**

United States Court of Claims.
Dec. 11, 1964.
Rehearing Denied March 12, 1965.

David W. Richmond, Washington, D. C., for plaintiff. Clarence T. Kipps, Jr., Miller & Chevalier, Washington, D. C., and Musick, Peeler & Garrett, Los Angeles, Cal., on the briefs.

Jerome Fink, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. C. Moxley Featherston, Lyle M. Turner, Philip R. Miller, and J. Mitchell Reese, Jr., Washington, D. C., on the brief.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

LARAMORE, Judge.

This is a suit for refund of Federal income taxes for the year 1952 in which the ultimate question presented is whether the amounts paid by taxpayer to transferors of "oil allowables" constitute royalties so that, under section 114(b) (3) [1]

---

1. Section 114 provides in pertinent part as follows:

"§ 114. Basis for depreciation and depletion. * * *

"(b) Basis for Depletion.—* * *

"(3) Percentage Depletion for Oil and Gas Wells. In the case of oil and gas wells the allowance for depletion un-

der section 23(m) shall be 27½ per centum of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. * * *."

of the Internal Revenue Code of 1939, such payments must be excluded from gross income before computing taxpayer's depletion allowance. The answer to this question depends on whether the assignors of the allowables had a depletable "economic interest" in the oil in place with respect to the oil produced under these allowables. Taxpayer asserts it is the only one entitled to claim depletion. The government urges that the transferors of the allowables have the requisite "economic interest" to entitle them to share in the depletion deduction allowed by section 23(m) [2] of the Internal Revenue Code of 1939. It is not disputed that either the taxpayer or the transferors (but not both) is entitled to claim depletion with respect to the amounts paid to the transferors for these allowables.

During the year 1952, Tidewater was the owner and operator of various oil and gas leases located in the East Texas Oil Field. That Field is under the control and supervision of the Texas Railroad Commission, which exercises authority over oil and gas drilling and production operations in the State of Texas. The Railroad Commission makes monthly determinations of the number of barrels of oil which can be produced from each well. Each well in the Field is assigned an allowable in barrels per producing day by the Railroad Commission. In addition to the proration of the number of allowable barrels to be produced per well, the Railroad Commission also establishes the number of days each month during which each well can produce. The amount so fixed is referred to as the "allowable" for each well.

The record discloses that the East Texas Oil Field is about 42 miles long (north to south) and 4 to 8 miles wide (east to west).[3] The Field has been described as a large pool or reservoir of oil, having a natural water drive from west to east, produced by encroaching subterraneal water which bounds the field on the west. Bottom-hole pressure, which forces oil to the surface through the wells drilled in the field, is created and maintained by this natural water movement. The extent and ease of production of oil are determined in the main by the water-oil contact. As oil is withdrawn, water moves from the west to replace it and sweeps the oil along in the process.

As early as 1938, it was realized that withdrawal of salt water from the field must be curtailed both to prevent a drop in bottom-hole pressure (which would reduce total recoverable oil reserves and increase production costs) and to prevent pollution of fresh water supplies. Two methods of achieving this result were developed. The first was to encourage reinjection of salt water into the field;[4] the second was to encourage owners and operators to close wells producing excessive amounts of salt water and transfer production to other wells in the field which were not producing salt water.[5] These transferable rights to pro-

---

2. Section 23 provides in pertinent part as follows:

"§ 23. Deductions From Gross Income. In computing net income there shall be allowed as deductions: * * *

"(m) *Depletion.* In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * * In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. * * *"

For percentage depletion allowable under this subsection, see section 114(b), (3) and (4).

3. See Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) for an extensive description of the East Texas Oil Field.

4. An operator who reinjected salt water that had been produced, or who engaged someone to do it for him, was given an additional oil allowable for reinjecting salt water into the reservoir.

5. An operator who closed down a well producing more than 100 barrels of salt water a day was permitted, beginning in 1942, to transfer his allowable to other wells on the same lease, and later was

duce are referred to as "salt-water shut-in allowables."

It is the second method which gives rise to the problem involved in this case. By order dated July 10, 1947, the Railroad Commission permitted the operator of any well in the field producing 100 or more barrels of water a day, to shut in that well and transfer its "allowable" to another well or wells producing less than 25 percent water. The transferred allowable would be added to the transferee's existing allowable to increase production from the transferee's well or wells to the extent of the allowable transferred. After the transferred allowable ceased, the transferor operator could reopen the shut-in well and resume production under the applicable Railroad Commission Order if it chose to do so.

Taxpayer acquired from other unrelated operators a number of such salt-water shut-in allowables, and during the year 1952 a portion of taxpayer's production of oil from its leases in the East Texas Oil Field was under these acquired allowables. Under the typical assignment of a shut-in allowable,[6] the assignor sold all of its rights to its allowable on specific wells and agreed that all of the oil produced by the assignee under the allowable should be property of said assignee. The assignee (taxpayer) agreed to pay assignor a stated price per barrel, which varied with the posted sales price "for each and every barrel of such transferred allowable which assignee produces * * *."

In its tax return for 1952, taxpayer did not claim depletion on the amounts paid to assignors; this amount was excluded from gross income in determining the base for depletion. Taxpayer later filed a timely claim for refund, asserting it was entitled to claim depletion on this amount. That claim was denied, and this suit followed.

As stated earlier, the decision in the case at bar turns on the question wheth-er the transferors of the allowables have the requisite "economic interest" to entitle them to share in the depletion deduction allowed by section 23(m) of the 1939 Code. The "economic interest" concept, which is used in defining the intended beneficiaries of percentage depletion, was originally formulated by the Supreme Court in Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933). The Court, aware of the necessity of creating a uniform law of taxation independent of the complexities of local law, freed the right to depletion allowance from "any special form of legal interest in the oil well" and reasoned that

"[t]he language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." [287 U.S. at 557, 53 S.Ct. at 226]

As pointed out recently in Commissioner v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956), the two requisites of an economic interest established by Palmer v. Bender, supra, are (1) that the taxpayer must have acquired by investment an interest in the mineral in place, and (2) that he look to the extraction and sale of the mineral for the return of this investment. Since Palmer v. Bender, quite naturally the battles in this area of tax law have been fought over whether there was an interest in the oil in place of the proper sort and whether the source of the return of the taxpayer's capital was the extraction and sale of mineral.

The major factor seriously in dispute between the parties, in the case at bar, involves the first criterion—an interest in

permitted, beginning in 1947, to transfer the allowable to other operators in the East Texas Oil Field.

6. See finding 11 where a typical assignment of a shut-in allowable is set out. [Finding 11 set out in Appendix.]

the oil in place.[7] The government espouses two theories—either one, it contends, provides the transferors of the allowables the requisite interest in the oil in place so as to entitle them to claim depletion on the amounts received from taxpayer for each barrel of oil produced pursuant to the transferred allowables. One view is based on the physical and geologic characteristics of the East Texas Oil Field. The government argues that since the Field is a common pool or reservoir of oil, when taxpayer was permitted to withdraw a greater quantity of oil made possible through the acquisition of the allowables, it in effect was withdrawing the oil under the transferors' closed wells. From this the government concludes that the economic interest in the oil in place under the closed wells which the transferors have, is sufficient to entitle them to depletion. In support of this argument the government points out that the Railroad Commission based the amount of the "salt-water shut-in allowable" which could be transferred according to a "decline curve" which was designed to approximate the oil which could have been produced from the closed well, had it remained in operation. On the other hand, taxpayer points out that there is nothing in the record to suggest that the oil under the transferors' leases was depleted, but on the contrary the Railroad Commission's Order specifically provided for the resumption of production by the transferors, after the expiration of the "allowable." Taxpayer also points out that it is a common occurrence in the East Texas Oil Field, that within a short distance from an extremely productive well, no oil is found. Moreover, the shut-in wells were scattered over most of the Field and are not limited to one region, as would be required by the government's theory. All these factors, taxpayer argues, contradict the government's conception that the East Texas Oil Field is a single large underlying pool of oil being tapped with equal facility by all the wells in the Field.

The general plan which the Railroad Commission attempted to carry out by the use of the "decline curve" in determining the amount of the "allowable" for each well, seems, at first blush, to support the government's position. However, for the "decline curve" to carry out its intended result, i. e., that at the expiration of the "allowable" the oil under the transferor's well would be depleted, the closed well must remain in operation. Assuming that the Railroad Commission was justified in making such a prediction, it does not follow that the oil under a *closed* well would be depleted as a result of the transfer of its allowable.[8] Moreover, there is nothing in the record before us which shows that these closed wells were *in fact* depleted. Nor can we conclude from the evidence before us, that the amount of oil beneath taxpayer's wells was increased as a result of the alleged flow of oil from the transferors' closed wells.[9] All we know is that the oil which was being extracted came from

7. Taxpayer, during oral argument, urged that the transferors did not meet the second requirement of "an economic interest." This second factor has been interpreted to mean that the owner of the interest must look *solely* to the extraction of oil for a return of his capital, and depletion has been denied where the payments were not dependent on production. Helvering v. Elbe Oil Land Development Co., 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904 (1938). Taxpayer argues that it had to pay the transferors regardless of whether or not it produced oil under the "allowables." It cites P. G. Lake, Inc. v. Commissioner, 24 T.C. 1016 (1955) in support of its contention. Although the Tax Court based its decision on the testimony of an official of the producing company, a reading of the assignment contract before us indicates that the payments to the transferors were to be based solely on production.

8. We think that the use of the "decline curve" can better be explained on the grounds that the Railroad Commission, faced with the problem of curtailing the loss of bottom-hole pressure as a result of some wells producing an excessive amount of salt water, had to devise a basis for determining the amount of the allowable that could be transferred. The use of the "decline curve" was a fair basis for the estimate.

9. Admittedly as a result of this conservation measure, which prevented the drop in bottom-hole pressure, taxpayer was

taxpayer's wells, and since none was produced from the transferors' closed wells, there is a fair presumption that whatever oil was under their lease when the allowable was transferred would still be there when the allowable expired. Even if the transferors' wells did not have as much oil under their leases when the "allowable" expired, there is no evidence in the record which shows that taxpayer's production pursuant to the transferred allowable was the cause of the decrease.[10] Therefore, under such circumstances, we cannot conclude that as a matter of physical and geologic reality the transferors had an interest in the oil in place under the taxpayer's wells.

We turn now to the government's second theory in support of its contention that the transferors have the requisite investment in the oil in place. It argues that the facts in this case come within the rationale of Southwest Exploration Co., supra, since the assignors of the allowables transferred a property interest which was essential to taxpayer's right to extract the oil in question.

In this area of tax law it is difficult to single out one recurring factor which the courts have found to be indicative of an interest in the minerals in place. The history of economic interest litigation is better described as the story of ascertaining which of several basic characteristics may be omitted without eliminating the possibility of such an interest. A leading authority on depletion,[11] after an exhaustive analysis of the jurisprudence in this area, concluded that

> "[i]n determining the existence of an interest in the minerals in place three basic ideas are involved, viz., the legal form or nature of the instrument, the degree of substantial ownership of the deposit possessed by the interest holder, and the extent and nature of his contribution to development and operation of the property. A legal property interest in the minerals, lasting for the productive life of the property, entitling its holder to significant control of the mineral deposits and beneficial enjoyment of income therefrom, and acquired as the consequence of a contribution to its development or operation, is plainly an interest in the minerals in place. Drop one of these characteristics and the solution of the issue is less certain; drop two and serious doubts arise."

We view our function in this area of tax law as one of weighing these various factors in each case and determining whether their presence or absence are indicative of or preclude the existence of an interest in the minerals in place. In so doing, we must recognize that the purpose of discovery depletion should shape the result which we reach. In this respect we must emphasize the fact that Congress sought to encourage the discovery and development of minerals. We recognize also that the Supreme Court decisions reflect a growing liberality in the application of these criteria.[12] How-

---

able to obtain a greater amount of recoverable oil under its leases. But this does not mean that there was an actual increase of oil under taxpayer's lease.

10. The government argues that in the event we find that the record before us is insufficient to support the government's contentions, taxpayer nevertheless has failed to meet its burden of proof. We think that the facts before us are sufficient to make a *prima facie* case in favor of taxpayer. It has shown that all the oil which was produced came from its well and none came from the transferors' wells. This raises the presumption that the oil beneath its leases was being depleted. The burden is on the

government to prove the contrary. We think that the government has not met this burden.

11. Sneed, The Economic Interest—An Expanding Concept, 35 Texas L.Rev. 307, 355 (1957).

12. This liberal trend can easily be traced commencing with Lynch v. Alworth-Stephens Co., 267 U.S. 364, 45 S.Ct. 274, 69 L.Ed. 660 (1925) and continuing thru Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225 (1933), Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324 (1937), Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062 (1946) and Commissioner v. South-

638

ever, we do not think it proper for us to take the lead and spearhead this apparent trend. In other words, we should not go beyond the guidelines set forth by the Supreme Court.

In this case the government equates the transferors of the "allowables" with the upland owners in Southwest Exploration who had "made an indispensable contribution of the use of *real property*" to the drilling for and the *extraction* of oil. (350 U.S. at 317, 76 S.Ct. at 400). At the outset it should be noted that aside from Southwest Exploration no Supreme Court decision has found a taxpayer possessing the requisite interest in the mineral in place who did not have either a fee or a leasehold interest in the oil-producing property itself. This apparent departure from prior doctrine can best be explained on the grounds that the granting of discovery depletion in that case served the purposes for which the allowance was created. That is, the upland owners in that case contributed *real property* which was essential to the *discovery, drilling,* and *extraction* of the oil. Without their participation, there would have been no lease, no wells and no production. In exchange for this contribution, the upland owners acquired an interest which was measured by the producing life of the wells and they could look to the extraction and sale of oil as a source of return for that interest. In other words, "[t]heir income was dependent entirely on production, and the value of their interest decreased with each barrel of oil produced." (350 U.S. at 316, 76 S.Ct. at 400) Not only were they instrumental in the acquisition of the lease, but also they "played a vital role at each successive stage of the proceedings." (Id. at 315, 76 S.Ct. at 399) The Court felt that although the upland owners did not have a legal property interest in the minerals nor did they have control over the mineral deposits, their contribution to development and opera-

tion was sufficiently significant to indicate an investment in the oil in place. However, the Court cautioned that they were not taking a drastic step from prior doctrine when they stated:

"We decide only that where, in the circumstances of this case, a party *essential* to the *drilling* for and *extraction* of oil has made an indispensable contribution of the use of *real property* adjacent to the oil deposits in return for a share in the net profits from the production of oil, that party has an economic interest which entitles him to depletion on the income thus received."
[Emphasis added. 350 U.S. at 317, 76 S.Ct. at 400]

In the case at bar, the transferors like the upland owners did not have a legal property interest in the minerals, nor did they have control over the mineral deposits. Thus their entitlement to share in the depletion allowance must be based on their contribution to the development or operation of the mineral deposits. It seems fair to say that their contribution was not as significant a contribution as was made by the upland owners in Southwest Exploration Co. Their contribution was personal property rather than real property; it was at best indispensable for the extraction of only part of the oil; it was not instrumental in the acquisition of the lease, nor was it essential to the drilling operations. Unlike Southwest Exploration Co., the interest the transferors acquired was not measured by the productive life of the wells but was to be terminated at the expiration of the "allowables." Under these circumstances, to find in the case at bar, an interest in the minerals in place, would require us to go beyond the guidelines set forth by the Supreme Court in Southwest Exploration Co. Moreover, to do so, we think, would do violence to the clear congressional purpose in granting discovery depletion.[13] Consequently, we hold that

west Exploration Co., 350 U.S. 308, 76 S.Ct. 395 (1956). However, the most recent pronouncement in this area, Parsons v. Smith, 359 U.S. 215, 79 S.Ct. 656,

3 L.Ed.2d 747 (1959) cannot be described as a continuation of this apparent trend.

13. This is especially true, if at the expiration of the allowables, the transferors

the transferors of the "allowables" here in question do not have the requisite "economic interest" in the oil in place with respect to the oil produced under these allowables so as to entitle them to share in depletion allowance. Therefore, taxpayer is entitled to take the depletion allowance in question, since the amounts paid by it to these transferors do not constitute royalties and need not be ex- before computing its depletion allowance for 1952.

Accordingly, judgment is entered for taxpayer with the amount of recovery to be determined pursuant to Rule 47(c) (2) of the Rules of this court.

### APPENDIX

11. The following is a typical "Assignment of Shut-in Allowable":

"Assignment of Shut-in Allowable

"This agreement, made as of the First day of November, 1951, be-tween ELM OIL COMPANY et al, hereinafter called 'ASSIGNOR', whose mailing address is P. O. Box 839, Dallas, Texas, and TIDE WA-TER ASSOCIATED OIL COMPA-NY, hereinafter called 'ASSIGNEE', with an office in Houston, Texas, WITNESSETH:

"Assignor represents that it has heretofore made application to the Railroad Commission of Texas for the transfer of the oil allowable of the #2 and #3 wells on Assignor's L. L. Jones lease which is a tract of 15 acres, more or less, out of the Cor-duva Survey of Rusk County, Texas, and is in the East Texas Oil Field; that the application was made pur-suant to an order of the Railroad Commission of Texas, herein called 'Commission', of July 10, 1947, No. 6–10,956, Oil and Gas Docket No. 120; that Assignor now owns and operates the oil and gas lease on which the wells to be shut in are lo-cated; that the application, in con-formity with the procedure estab-

lished by the commission, bears the approval of the District Supervisor and the District Engineer of the Commission with respect to (a) the right of Assignor to transfer, for production by other wells in said Field, the amount of oil allowable as stated in the approved application, and (b) the transfer to the Assignee, named herein, of the right to produce all of the allowable applicable to the shut-in wells.

"Assignor, for a valuable consid-eration, hereby sells, transfers and assigns unto Assignee all of Assign-or's right to produce the oil in the said Field in the amounts to be ap-proved monthly by the Railroad Com-mission of Texas. Assignor repre-sents and warrants that Assignor has the right to make this assign-ment and has not sold or assigned or encumbered in any way the rights herein transferred to Assignee. As-signor further represents and war-rants that the lease on which the specified shut-in wells are located is in full force and effect and will be maintained by Assignor in full force and effect during the life of this agreement.

"This assignment shall take effect on the First day of November, 1951. All of the oil produced by Assignee under this agreement shall be the property of Assignee.

"This assignment is subject to the orders of, and the approval of said Commission, the approval and desig-nation by the Commission of the wells and lease from which, and the time at which the allowables, the rights to produce which are herein assigned, may be produced by Assignee, and the designation, by the Commission, in its allowable schedules, of the amount of such allowables which As-signee may produce.

"Subject to the other provisions hereof, Assignee agrees to pay to

were to reopen the closed wells and re-sume production. In that event, the

transferors would be entitled to depletion twice.

Assignor a sum of money equivalent to Two Dollars and Four Cents ($2.04) for each and every barrel of such transferred allowable which Assignee produces after November 1, 1951; provided, however, that if at any time hereafter during the life of this contract Tide Water Associated Oil Company has in effect in the East Texas Field an open division order posted price in excess of 2.65 per barrel for the regular oil allowables in said Field, then and in that event, and for each and every barrel of such transferred allowable which Assignee produces during the time such price in excess of $2.65 is posted, Assignee agrees to pay to Assignor a sum of money (in addition to said $2.04) equivalent to 84% of the excess of such posted price per barrel (in effect at the time such transferred allowable is produced) over and above $2.65. It is further provided that if at any time hereafter, during the life of this contract, Tide Water Associated Oil Company has in effect in the East Texas Field an open division order posted price less than $2.65 per barrel for the regular oil allowable in said Field, then and in that event, and for each and every barrel of such transferred allowable which Assignee produces during the time such price less than $2.65 is posted, Assignee agrees to pay to Assignor, in lieu of and instead of the $2.04 per barrel first hereinabove provided for, a sum of money equivalent to $2.04 less 84% of the difference between such posted price and $2.65. Accounting is to be made on or before the 25th day of each month for the transferred allowable oil produced hereunder during the preceding calendar month.

"Assignor agrees that if Assignee's or Assignor's rights hereunder should come into dispute or litigation Assignee may withhold payment of any sum (to the extent of the amount claimed in such dispute or litigation) payable hereunder, without interest, until final adjudication or other settlement of such dispute or litigation.

"Assignor agrees to make settlement with or payment to all royalty owners and all other parties who have or acquire any interest in the allowable transferred hereunder and agrees to indemnify and save Assignee harmless from any loss, cost, damage or expense suffered or incurred by Assignee by reason of its purchase of or payment for the rights herein conveyed, or by reason of any failure of Assignor to perform any of its obligations arising hereunder.

"In witness whereof, this instrument is executed on the date first above written."