Jesse C. Brown and Eula M. Brown v. Commissioner.
Brown v. Commissioner
Docket No. 1735-64.
United States Tax Court
T.C. Memo 1965-321; 1965 Tax Ct. Memo LEXIS 9; 24 T.C.M. (CCH) 1786; T.C.M. (RIA) 65321; December 15, 1965
*9 Held, that petitioner, in the years in question, did not possess an economic interest in coal in place, and that he is therefore not entitled to deductions claimed for percentage depletion with respect to the coal which he mined. Thomas N. Chambers *10 and Carl J. Nutter, 709 Kanawha Valley Bldg., Charleston, W. Va., for the petitioners. Rodney G. Haworth, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the taxable years 1961 and 1962 in the respective amounts of $23,133.40 and $18,719.14, and an addition to tax, under section 6654 of the Internal Revenue Code of 1954, for the taxable year 1961 in the amount of $177.70, for underpayment of estimated tax. The petitioners having conceded liability for the addition to tax, the only remaining issue is whether the petitioners, during the years in question, possessed an economic interest in coal mined, entitling them to deductions for depletion under sections 611 and 613(b)(4) of the Code. Findings of Fact The petitioners are husband and wife residing in East Rainelle, West Virginia. Their joint Federal income tax returns for the taxable years 1961 and 1962 were filed with the district director of internal revenue, Parkersburg, West Virginia. Petitioner Eula M. Brown is a party herein only by reason of having filed joint returns with her husband, Jesse *11 C. Brown, and the latter will hereinafter be referred to as the petitioner. On May 1, 1954, Royalty Smokeless Coal Company (hereinafter referred to as Royalty Smokeless) leased from the Estate of John Nuttall "all of the coal in the seam known as the Sewell Seam in, under and upon that certain tract of land situate near Clifftop in Sewell Mountain District of Fayette County, West Virginia." Royalty Smokeless was to prosecute the mining of the coal on the property and was to pay royalties to the lessor. The lease further provided: The Lessee further agrees that it will not mortgage the demised premises or its rights therein, nor permit any liens, judgments or executions to be levied and issued against Lessee, nor will Lessee sublet, assign or sell this leasehold or the rights therein granted to Lessee, without the consent of the Lessor first had in writing. * * * Petitioner is and has been for about 28 years a self-employed coal operator, operating under the name of the Peaser Branch Coal Company. Sometime in 1956 petitioner, pursuant to an oral agreement with Royalty Smokeless (the details of which are not shown), opened a drift mine, designated as Peaser Branch No. 3, on the *12 above property leased by Royalty Smokeless and began mining the coal therein. On September 18, 1958, Royalty Smokeless and petitioner entered into a written agreement whereby petitioner, as an independent contractor, convenanted to mine all of the merchantable coal contained in the Sewell Seam in Peaser Branch No. 3. The agreement provided that title to all of the coal mined was to remain in Royalty Smokeless, and petitioner was required to deliver all coal mined to Royalty Smokeless at the latter's Floyd's Creek tipple. However, Royalty Smokeless was not obligated to accept delivery of coal when such tipple was not being operated and receiving Sewell Seam coal. Petitioner was to receive $4 per ton for his services as an independent contractor in mining, removing and delivering the coal. It was also agreed that if petitioner did not maintain a minimum productive capacity of 50 tons per day, Royalty Smokeless would have the option to terminate the arrangement upon ten days' notice in writing. The agreement was effective for the period September 18, 1958 through August 29, 1959, and thereafter on a month-to-month basis, with the right of either party to terminate the contract at the *13 end of any month by giving to the other fifteen days' notice in writing. The petitioner mined Peaser Branch No. 3 with conventional equipment until 1961. In 1961 petitioner purchased from the Wilcox Manufacturing Company mining equipment consisting primarily of two coal mining machines identified as continuous miners, and two conveyors. The total cost of these four items (including insurance and carrying charges) was $103,287.37. Petitioner was able to purchase this equipment without making any downpayment by executing chattel mortgages covering the equipment purchased and equipment which he already owned, and representing to the seller that he was assured of an adequate supply of coal to mine. He told the manufacturing company that he was operating under a lease. The installation of the continuous miners required expenditures by the petitioner in 1961 for equipment, such as new belting and a larger power line, and other expenditures, including labor, for building a road, widening passages, and providing greater ventilation, totaling altogether between $36,000 and $40,000. [1]
*14 The petitioner continued to operate the mine through June 1962, using the continuous miners. The use of the continuous miners resulted in the production of a lower quality of coal, but the production increased from 58,000 tons in 1960 to over 100,000 tons in 1961 and 86,000 tons in the first half of 1962. Except for the increased production, and resulting increased cost of production, the operations in 1961 and 1962 were not different from the operations in 1960. The petitioner continued to deliver the coal to Royalty Smokeless as raw material for processing and continued to receive payment therefor at a flat fee per ton. Petitioner did not process the coal and did not attempt to sell any of it. In June 1962 the petitioner encountered a fault area which prevented further mining, and he removed and reconditioned his equipment for use in another mining operation. The only written agreement existing between the petitioner and Royalty Smokeless was the above agreement of September 18, 1958. Petitioner paid nothing to Royalty Smokeless for the right to mine the coal. At all times material to this proceeding, Royalty Smokeless assumed the full responsibilities to its lessor, the Nuttall *15 estate, in accordance with the terms and conditions of its lease of May 1, 1954. This included the payment of royalties and real estate taxes on the property. Petitioner did not assume any of the responsibilities or duties prescribed in such lease. The petitioner paid no real estate taxes with respect to any interest in the coal. On September 10, 1962, Royalty Smokeless assigned its lease to Clifftop Smokeless Coal Company. Royalty Smokeless warranted that it had good and marketable title as lessee and that the same was free and clear of all liens, claims, encumbrances and liabilities. On April 1, 1963, Clifftop Smokeless Coal Company entered into an agreement with the petitioner, granting him the exclusive right to mine the Sewell Seam. Under the agreement petitioner was not obligated to sell the coal mined to Clifftop Smokeless Coal Company. Thereafter, petitioner opened a mine on the side of the hill opposite Peaser Branch No. 3. In his income tax returns for years prior to 1961 the petitioner did not claim deductions for depletion with respect to the coal mined. However, in his income tax returns for the taxable years 1961 and 1962 he claimed deductions for percentage depletion, *16 in the respective amounts of $38,399.56 and $32,553.26, with respect to the coal mined from Peaser Branch No. 3 and delivered by him to Royalty Smokeless in those years. In the notice of deficiency the respondent disallowed these deductions, stating: As it is determined that you do not have an economic interest in the coal in place, and are not entitled to a deduction for depletion, your taxable income is, therefore, increased by the amount of the deduction claimed on your return. In its income tax return for 1962 Royalty Smokeless claimed depletion with respect to the coal delivered to it by the petitioner. Its operations for 1961 were not profitable and for that reason it did not claim a depletion deduction for that year with respect to coal delivered to it by the petitioner. Opinion The petitioner contends that he is entitled to percentage depletion deductions with respect to the coal which he mined in the taxable years 1961 and 1962. There are set forth in the margin pertinent provisions of the Internal Revenue Code of 1954. [2] It will be noted that under section 611(a) the allowance for depletion is to be made under regulations prescribed by the Secretary or his delegate. *17 There is set forth in the margin the pertinent portion of the regulations in this respect. [3]
*18 It is well settled by Supreme Court decisions that annual deductions for depletion are allowed only to the owner of an economic interest in the mineral mined. Parsons v. Smith, 359 U.S. 215; Paragon Jewel Coal Company, Inc. v. Commissioner, 380 U.S. 624; and cases cited therein. The Paragon Jewel case stands for the proposition that a lessee's interest constitutes an economic interest in the coal in place, but that the interest of a so-called "contract miner," who mines coal at this own expense and delivers it to the owner or lessee of the coal land for a fixed fee per ton for mining, is not an economic interest in the coal in place. The court held that the investments by such a miner in equipment and improvements necessary to perform his contract did not represent an investment in the coal in place. Petitioner concedes that the contract dated September 18, 1958, gave him only a contractual interest and that under it he did not obtain an economic interest in the coal in place. Nor does he claim that his investment in equipment and improvements gave him an economic interest in the coal in place, in view of the holdings in the Parsons and Paragon Jewel cases. *19 He does contend, however, that in early January 1961, Royalty Smokeless orally granted him a lease [4] under which he had the right to mine the Sewell Seam to exhaustion, in consideration of his undertaking to make the necessary investments in equipment to increase his production, and that this oral lease gave him a depletable interest in the coal. It is his position that even though such lease was oral it must be recognized as a valid lease because of his full performance thereunder. He therefore contends that the Paragon Jewel case is not determinative of the issue here presented, pointing out that the contract miners in that case made no contention that they were operating under a lease or sublease. In support of his contention that during the years in question he was operating under an oral lease, the petitioner testified, in effect, that in 1960 E. W. Potter, vice president and general manager of Royalty Smokeless, told him that Royalty Smokeless needed more tonnage from him if at all *20 possible; that later he told Potter that to accomplish this he would have to make a large investment in new equipment, including the purchase of so-called continuous miners; that he asked Potter whether he would give him a lease to mine the coal to exhaustion (in order that he would be able to mine enough coal to pay for the equipment) and therefore not be subject to the risk of termination, on 15 days' notice, of his right to mine the coal as provided in the existing written agreement; that Potter stated that he would consult his superior in Richmond and let petitioner know in a few days; that in early January 1961, Potter told him to go ahead and consider he was working under a lease agreement, that he could mine the coal to exhaustion, and to make the change-over necessary to produce more tonnage; that he did make the changeover; that the understanding with Potter was never reduced to writing; that he did not discuss with Potter the matter of reducing the agreement to writing until the spring of 1962 when his accountant advised him to do so; that Potter told him that they "would get around to it"; that in early 1963 he again, upon the advice of his accountant who was preparing his *21 income tax return, discussed with Potter the matter of reducing the agreement to writing; that at that time he realized that Potter did not intend to reduce the agreement to writing; and that it was his belief that he was working under a lease agreement in 1961 and 1962 "which Mr. Potter told me I would get." On the other hand, Potter, who was called as a witness by the respondent, testified that he never asked petitioner to produce more coal; that when the petitioner consulted him about installing the continuous miners he told petitioner that the increased tonnage of lower quality coal would put a burden upon the plant, but that he did not tell him not to buy the new equipment; that there was no discussion as to petitioner's status in the event he did invest in these continuous miners; that petitioner did not request a lease or the right to mine to exhaustion; that he did not have the authority to, and did not, enter into an oral lease with the petitioner; that the only discussion which he had with the petitioner regarding percentage depletion was a discussion held in 1962; and that at that time, after consulting with the president of Royalty Smokeless, he advised the petitioner *22 that Royalty Smokeless continued to own the coal and to pay the operator's royalty, that it intended to continue to take percentage depletion with respect to the coal mined, and that the arrangement between Royalty Smokeless and petitioner was that of lessee and contractor. Thus, there is a direct conflict between the testimony of the petitioner and that of Potter as to whether during the years 1961 and 1962 the petitioner was operating under an oral agreement. Under all the circumstances we think it probable that the petitioner did have some understanding with Potter that he would be permitted to continue to mine coal in sufficient quantity to justify petitioner's large expenditures for new equipment and improvements. It may well be that Potter agreed, on behalf of Royalty Smokeless, that the petitioner would be allowed to mine the coal to exhaustion. But, as pointed out in Paragon Jewel Coal Company, Inc. v. Commissioner, supra, such a right, without more, would not constitute an economic interest in the coal in place. The testimony of the petitioner that he believed that in 1961 and 1962 he was working under a lease agreement, based upon Potter's statement to him *23 to consider that he was working under a lease agreement, is not, in our opinion, sufficient to establish that the petitioner was orally granted a sublease. The petitioner did not specify the terms of the alleged agreement, except to state that Potter told him that he could mine the coal to exhaustion. There was no testimony to the effect that Potter agreed that the petitioner should have the right to sell coal to anyone else. Nor was there any testimony with respect to the payment of any royalties by the petitioner. The evidence shows that the petitioner did not pay, by way of royalties or otherwise, any amount for the privilege of mining the coal. Rather, Royalty Smokeless continued to pay him a flat fee per ton of coal delivered by him. It appears that he continued to operate in essentially the same manner as he had done in prior years under the contract of September 18, 1958. It may be further added that while Potter and the petitioner did discuss the matter of percentage depletion, the evidence indicates that there was no agreement reached whereby Royalty Smokeless intended to surrender its right to claim depletion upon the coal mined. In addition, there is no evidence to show *24 that Royalty Smokeless ever attempted to obtain permission of its lessor to enter into a sublease, as provided in the lease from the Nuttall estate. Upon this record we must conclude that the petitioner did not, in the years in question, operate under an oral lease from Royalty Smokeless, that he did not possess an economic interest in the coal in place, and that therefore he is not entitled to the claimed deductions for percentage depletion with respect to the coal mined by him. It should be added that, among other things, the respondent contends that an oral lease such as the petitioner claims he had would not be merely voidable, but would be void under the law of West Virginia, and that it would be ineffective to transfer to the petitioner an economic or any other interest in the coal in place. In view of our conclusion above that the petitioner has not established that there was an oral lease, it is unnecessary to consider this question raised by the respondent. Decision will be entered for the respondent. Footnotes
1. The amounts expended for equipment were capitalized by the petitioner and depreciation was claimed by him on such equipment. The depreciation claimed on the continuous miners for the taxable years 1961 and 1962 totaled $75,313.80. Certain other costs, including costs of labor, were claimed as deductions as ordinary and necessary business expenses.↩
2. Section 611 of the Code provides in part as follows: (a) General Rule. - In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. * * * Section 613 of the Code provides in part as follows: (a) General Rule. - In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property * * *. (b) Percentage Depletion Rates. - The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows: * * *
(4) 10 percent - asbestos (if paragraph (2)(B) does not apply), brucite, coal, lignite, perlite, sodium chloride, and wollastonite. ↩
3. Section 1.611-1(b)(1) of the Regulations provides as follows: (b) Economic interest. (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest. * * *↩
4. While the petitioner refers to a "lease," we think his contention is that he was granted a sublease. There is no evidence to show an assignment to him by Royalty Smokeless of its lease.↩